Lisa Hill Fenning (LF-9016) – *Admitted Pro Hac Vice*
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, California  90071-1530
Tel:  (213) 621-6000 / Fax:  (213) 621-6100
lfenning@dl.com

Elizabeth M. Guffy (EG-8659) – *Admitted Pro Hac Vice*
DEWEY & LEBOEUF LLP
401 Congress Avenue, Suite 3200
Austin, Texas  78701
Tel:  (512) 226-0300 / Fax:  (512) 226-0333
eguffy@dl.com

Irena  M. Goldstein (IG-0736)
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York  10019-6092
Tel:  (212) 259-8000 / Fax:  (212) 259-6333
igoldstein@dl.com

*Counsel for Appellant*
*The Northwestern Mutual Life Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

| | |
|---|---|
| **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,** : | **Case No. 07-CV-7745 (RB)** (ECF Case) |
| : | |
| **Appellant,** : | Chapter 11 Case No. 05-17923 (ASH) |
| **v.** : | |
| : | (Jointly Administered) |
| **DELTA AIR LINES, INC. and THE POST-EFFECTIVE DATE COMMITTEE OF DELTA AIR LINES, INC.,** : | |
| **Appellees.** : | |

---------------------------------------------------------------X

## APPELLANT'S OPENING BRIEF ON APPEAL

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... i

JURISDICTION ................................................................................5

STANDARD OF REVIEW ....................................................................5

ISSUES ON APPEAL ..........................................................................6

STATEMENT OF THE CASE...............................................................6

    1. The "Test Case" Objections Process........................................6

    2. The Initial Decision Below .....................................................8

    3. The Court Invites Motions for Reconsideration .....................9

THE OPERATIVE DOCUMENTS.........................................................10

    1.    Provisions Governing Delta's Liability Under the TIAs .......11

    2.    Northwestern Mutual's Exclusive Right to the Tax Benefits and any Indemnity for the Loss Thereof .................................11

ARGUMENT AND AUTHORITIES.......................................................15

    I.    The Lower Court's "Bankruptcy Context" Rule of Contract Interpretation Contradicts Supreme Court Precedent...........................18

    II.    Application of State Law, Pursuant to Travelers, Requires Allowance of Northwestern Mutual's TIA Claims .................18

        A.    The Contracts Required Payment of the SLV Amount, in Full and in Cash, Before a Section 6(c) Defense is Effective ...............19

        B.    Partial Payment of the IT Claim Does Not Establish a Section 6(c) Defense. ....................................................20

    III.    The Bankruptcy Court Erred in Holding That the Term Sheet Deal Satisfied the Requirements of Section 6(c)...................23

CONCLUSION...................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### <u>Cases</u>

American Express Bank Ltd. v. Uniroyal,
562 N.Y.S.2d 613 (N.Y. App. Div. 1990) ............................................................... 19

Astroline Communications Co., Ltd. P'ship v. Astroline Co.,
1996 U.S. App. LEXIS 24940, at *5 (2d Cir. 1996) ............... 5

Butner v. United States,
440 U.S. 48 (1979) ................................................................... 17, 18

DeVanzo v. Newark Ins. Co.,
353 N.Y.S.2d 29 (N.Y. App. Div. 1974) .............................. 19

Fin. One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,
414 F.3d 325 (2d Cir. 2005) ..................................................... 5

Fiore v. Fiore,
389 N.E.2d 138 (N.Y. 1979) ................................................... 18

Krumme v. West Point Stevens, Inc.,
238 F.3d 133, 139 (2d Cir. 2000) ........................................... 19

RM 14 FK Corp. v. Bank One Trust Co., N.A.,
831 N.Y.S.2d 120 (N.Y. App. Div. 2007) ............................ 21

Terwilliger v. Terwilliger,
206 F.3d 240 (2d Cir. 2000) ................................................... 18

Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co.,
127 S. Ct. 1199 (2007) ................................... 1, 6, 15, 16, 17, 18

Vanston Bondholders Protective Comm.. v. Green,
329 U.S. 156 (1946) ................................................................. 17

Westmoreland Coal Co. v. Entech, Inc.,
100 N.Y.2d 352 (N.Y. 2003) ............................................. 19, 21

### <u>Statutes</u>

11 U.S.C. § 101(5)(a) ............................................................... 17

11 U.S.C. § 365 .......................................................................... 2

11 U.S.C. § 502(a) ................................................................... 16

28 U.S.C. § 158(a)(1) ................................................................ 5

## PRELIMINARY STATEMENT

This appeal seeks reversal of the erroneous disallowance of three claims filed by The Northwestern Mutual Life Insurance Company ("Northwestern Mutual") in the chapter 11 bankruptcy case of Delta Air Lines, Inc. and its affiliates ("Delta" or "Debtor").  In sustaining Delta's objection to those claims, the United States Bankruptcy Court for the Southern District of New York ruled that Delta had established a contractual defense to liability in the "context of bankruptcy" (D. 39, Decision at 14),[1] despite the fact that, under state-law standards, Delta's purported defense would have failed and Northwestern Mutual's claims would have been held valid and enforceable.  The bankruptcy court set forth its reasoning in a May 16, 2007 decision (the "Decision") and subsequently issued the July 27 order (the "Disallowance Order"), from which this appeal has been taken.  The Disallowance Order should be reversed because there is no such thing as a "bankruptcy context" rule of contract interpretation according to Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co., 127 S. Ct. 1199 (2007) ("Travelers"), and a long line of United States Supreme Court precedent.

Northwestern Mutual's claims arise from 1992 leveraged lease transactions in which Delta acquired the use of two MD-11 aircraft and one Boeing 767 aircraft.  Northwestern Mutual paid approximately 20% of the purchase price of each aircraft by way of investment through specially-created "owner trusts."  Delta leased the aircraft from the owner trusts, which pledged the leases and the aircraft as security for the nonrecourse debt that financed the remainder of the purchase price.  As the owner trusts' "owner participant" and sole beneficiary, Northwestern Mutual was required, for federal income tax purposes, to report the income and deductions attributable to the ownership and lease of the aircraft.  The debt and the collateral pledged to secure the nonrecourse debt are currently administered on behalf of the noteholders by Bank of New York ("BNY") (as to the MD-11s) and Bank of America ("BofA") (as to N182DN, the

---

[1]  Parenthesis followed by "D" refer to the appellant's designation of record and parenthesis followed by "CD" refer to the appellee's designation and counter designation.

Boeing 767) (each, an "Indenture Trustee").[2]  Precisely because Northwestern Mutual benefited from the accelerated depreciation allowance for the aircraft, Delta was able to finance its acquisition of these aircraft at highly favorable rates.

Each leveraged lease transaction was documented in a complex set of agreements (the "Operative Documents"):[3]  (i) the Lease Agreement between Delta and the owner trust (the "Lease"), (ii) the Participation Agreement among Delta, Northwestern Mutual, the owner trust, the Indenture Trustee, and a loan participant (the "Participation Agreement"), governing the relationships among the parties and the agreements, (iii) a Trust Indenture and Security Agreement between the owner trust and the Indenture Trustee (the "Indenture"), that, *inter alia*, pledges the aircraft and Lease as collateral for the debt, and (iv) an Indemnity Agreement between Delta and Northwestern Mutual (the "Tax Indemnity Agreement" or "TIA"), pursuant to which Delta is required to indemnify Northwestern Mutual for the extra taxes it must pay due to the recapture of accelerated depreciation – these lost tax benefits being defined as a "Loss" – if such Loss results from certain so-called "Trigger Events" that are not "excluded" from the scope of the indemnity.  (D. 13, Stevens Decl. Ex. 5, TIA §5(iv) and (vi)).[4]

Two such Trigger Events have occurred here: foreclosures on the aircraft and early termination of the Leases.  Delta defaulted on its payment obligations under the Leases and, after filing its Chapter 11 petition, "rejected" all three of them.[5]  As a result, BNY foreclosed on the two MD-11 aircraft in December 2005, thereafter selling them to third parties.  BofA exercised its remedies with respect to the Boeing 767, resulting in a deed-in-lieu-of-foreclosure transfer of Northwestern Mutual's ownership interest to the Indenture Trustee in December 2006.  Unlike

---

[2]   The structure and economics of the typical leveraged aircraft lease are described in the Response to TIA/SLV Objection 2.  (D. 12, Resp. of Northwestern Mutual at 6-8).

[3]   The Operative Documents governing the three leveraged leases are substantively the same. The parties agreed to use the contracts for N803DE, one of the MD-11s, as exemplars.  Because of their highly confidential, commercially sensitive pricing and other terms, redacted versions were filed, with the unredacted versions submitted under seal.  (D. 17, Order re Motion to Seal).

[4]   All contract references are to the exhibits to the Declaration of Karen Stevens (D. 13).

[5]   "Rejection" is the post-petition termination of a contract by a debtor.  See 11 U.S.C. § 365.

the MD-11s, the Boeing 767 was not sold to a third party; instead, BofA entered a partial settlement agreement with Delta (the "Term Sheet")[6] permitting Delta to continue to use that aircraft. Northwestern Mutual was excluded from the bilateral negotiations between Delta and the Indenture Trustee and did not consent to the Term Sheet deal. The three foreclosure transactions resulted in the exact type of adverse tax consequences to Northwestern Mutual against which the TIAs were intended to provide indemnification.

Northwestern Mutual filed three claims in the chapter 11 case seeking indemnification of its tax Losses under the TIAs (the "TIA Claims"). As to the foreclosed MD-11s, BNY filed claims for Lease damages calculated by deducting the net foreclosure sale proceeds from the "Stipulated Loss Value" ("SLV") specified in the Lease (the "MD-11 IT Claims"). BofA included N182DN in an omnibus proof of claim for numerous aircraft subject to the Term Sheet (the "Term Sheet Claim," and collectively with the MD-11 IT Claims, the "IT Claims").

It is undisputed that Northwestern Mutual has suffered a "Loss" as that term is defined in Section 5 of the TIA, because it has been "required to recapture all or any portion of the MACRS Deductions, the Interest Deductions or the Amortization Deductions" as a result of Delta's Lease defaults and the resulting foreclosure transactions. (TIA §5(a) at 12). Delta is obligated to indemnify Northwestern Mutual for such Losses in an amount determined by the formula set forth in the TIAs. (TIA §§2, 5(a) at 2, 11-13). After benefiting from 13 years of lower financing costs under these leveraged Leases, Delta now seeks to renege on its indemnity obligations.

Despite these uncontested facts and Northwestern Mutual's undisputed Loss, Delta objected to the TIA Claims on two alternative theories. First, Delta argued that the TIA Claims are *per se* duplicative of the IT Claims merely because they arise from the same transactions. The bankruptcy court rejected this argument, holding that Delta certainly could have contracted to pay damages to two different parties to the same transaction; the question was whether it did,

---

[6]  The Term Sheet is described in BNY's proof of claim for N182DN. (D. 30, Fenning Decl., Ex. 6, Term Sheet Claim.) Northwestern Mutual contends that the Term Sheet violated the Operative Documents, which prohibit Delta from re-leasing the aircraft from the Indenture Trustee.

the answer to which depends upon what the contracts provide.  Second, despite the Triggering Events, Delta argued that it is excused from liability pursuant to an "exclusion" clause in the TIAs (the "Section 6(c) defense").  That clause provides that "the Owner Participant shall not be entitled to any payment under Section 5 hereof in respect of any Loss . . . arising as a result of one or more of the following events . . . (c) Any event whereby the Lessee pays Stipulated Loss Value or Termination Value or an amount determined by reference thereto . . .."  (TIA §6(c) at 17).  Delta contends that, because the IT Claims will receive some distribution of Delta common stock under the plan of reorganization, the elements of the Section 6(c) defense have been proven.  Northwestern Mutual contends that Delta's Section 6(c) defense is not valid because the distribution of 50% of the SLV amount in the form of stock does not constitute payment in full in "U.S. dollars and in immediately available funds" as required by the terms of the Operative Documents (Lease §3(d) at 17; *see also* TIA §12 at 28).

If this matter had come before a New York state court on an enforcement action by Northwestern Mutual on the undisputed facts here, Delta could not win on its Section 6(c) defense because it has not paid the full SLV amount.  Had the full SLV amount been paid, Northwestern Mutual would already have received full compensation for its tax Losses pursuant to the Indenture's "waterfall" that requires distribution of all remaining SLV proceeds to Northwestern Mutual after satisfaction of the debt (the "SLV waterfall").  (Indenture §3.03 at 42).  If that crucial factual premise of the Section 6(c) defense fails – if Northwestern Mutual has **not** already received full compensation for its Losses from the full SLV payment in cash – then Delta is liable under the TIAs.  Instead of the promised full compensation from one or the other of SLV or TIA, Delta's interpretation results in no compensation for Northwestern Mutual's Loss, contrary to the purposes and terms of the Operative Documents.

Nevertheless, the bankruptcy court held that the TIA Claims must be disallowed in their entirety because the Lease and TIA contractual provisions requiring actual payment of the full contractual SLV amount in U.S. dollars do not apply in the "bankruptcy context."  Remarkably, the bankruptcy court reached this conclusion without even reading Northwestern Mutual's

Operative Documents and <u>without citation</u> to a single legal authority standing for that proposition.[7]  Rather than being based on the terms of the relevant contracts, the bankruptcy court's Decision on this point was guided by the bankruptcy court's own policy-based rationale for construing state-law contracts differently in bankruptcy proceedings.  The bankruptcy court rejected the principle that the contract terms governing the Section 6(c) defense must mean the same thing – and produce the same result as to Delta's liability under the TIA – in a bankruptcy courtroom as in a New York state court.

The bankruptcy court's application of its "bankruptcy context" rule of contract interpretation and its refusal to determine Northwestern Mutual's contract claims under applicable standards of New York law constituted plain error.  Northwestern Mutual respectfully requests that this Court reverse the ruling below, direct the bankruptcy court to enter an order allowing the TIA Claims as to liability, and remand for determination of their proper amounts.

**JURISDICTION**

On July 18, 2007, the bankruptcy court entered the Disallowance Order granting Delta's motion for reconsideration, denying Northwestern Mutual's motion, and disallowing the TIA Claims.  The Disallowance Order is a final order determining Northwestern Mutual's TIA Claims.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

**STANDARD OF REVIEW**

This appeal involves solely questions of contract interpretation which, as matters of law, are subject to *de novo* review by this Court.  <u>See</u> <u>Fin. One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.</u>, 414 F.3d 325, 339 (2d Cir. 2005) ("We review contract interpretation *de novo*."); <u>Astroline Communications Co., Ltd. P'ship v. Astroline Co.</u>, 1996 U.S. App. LEXIS 24940, at *5 (2d Cir. 1996)) ("In assessing a bankruptcy court's interpretation of a contract, we review its textual interpretation *de novo* . . ..").

---

[7]    The bankruptcy court admitted that it had not read the Operative Documents to which Northwestern Mutual was a party; rather, it relied upon the documents at issue in TIA/SLV Objection 1, which differed in material respects from Northwestern Mutual's contracts.  (D. 39, Decision at 14 n.3).

5

## ISSUES ON APPEAL

1.       Whether the bankruptcy court erred as a matter of law by applying a "bankruptcy context" rule of contract interpretation, given that Travelers and other controlling precedents require that the TIA Claims be determined in accordance with applicable state law rules of contract interpretation.

2.       Whether the bankruptcy court erred as a matter of law in holding that, "in the context of bankruptcy," Delta's distribution of stock (not U.S. dollars) worth only about 50% of the value of the IT Claims satisfied the contractual prerequisites for establishing a defense of full "payment" of SLV pursuant to Section 6(c) of the TIAs, where the terms of the Operative Documents, interpreted under New York law, require payment of SLV in cash and in full.

3.       Whether the bankruptcy court erred as a matter of law in holding that Delta could satisfy the elements of a Section 6(c) defense and thereby nullify the TIA with respect to the Boeing 767 by stipulating to damages pursuant to the Term Sheet compromise with BNY (i) on terms that violated express provisions of the applicable contracts prohibiting Delta from keeping the aircraft, and (ii) that was negotiated without Northwestern Mutual's participation or consent.

## STATEMENT OF THE CASE

**1.       The "Test Case" Objections Process.**

In August 2006, Northwestern Mutual timely filed its TIA Claims, totaling approximately $85 million, seeking indemnification under the TIAs.  (D. 30, Fenning Decl., Ex. Nos. 1, 2, and 3). The Indenture Trustees filed their IT Claims for Lease damages totaling approximately $167 million relating to the same three aircraft.  (Id., Ex. Nos. 4, 5, and 6).[8]  On February 20, 2007, Delta and the Official Creditors Committee[9] jointly filed their TIA/SLV Objection 2:  Objection

---

[8]   All of the TIA and SLV claims were treated as "disputed" for purpose of plan confirmation.  Accordingly, pursuant to the order confirming the plan, Delta has reserved the full face amount of these claims as part of the Disputed Claims Reserve, pending entry of a final, non-appealable order determining their allowability.

[9]   At the time TIA/SLV Objection 2 was filed, the Committee was known as the Official Committee of Unsecured Creditors.  Its name, and to some extent its role, changed upon plan confirmation effective on April 30, 2007.

by Delta Air Lines, Inc. and the Official Committee of Unsecured Creditors to Certain Claims Filed by Northwestern Mutual Life Insurance Company and the Bank of New York for Tax Indemnities and Stipulated Loss Values ("TIA/SLV Objection 2"), seeking to disallow Northwestern Mutual's TIA Claims or, alternatively, to disallow the "overlapping" portion of the IT Claims. (D. 2, TIA/SLV Obj. 2).

TIA/SLV Objection 2 was not Delta's first objection seeking disallowance of the TIA Claims. During the fall of 2006, Delta filed a blanket objection to all TIA claims totaling approximately $1 billion, filed by owner participants in the case (including those of Northwestern Mutual) alleging that, as a matter of law, the TIA claims were "duplicative" of the IT claims arising out of the same transaction. At a January 31, 2007 hearing, the bankruptcy court disapproved of the mass objection approach and instructed Delta to refile objections based upon the specific contractual language in the relevant contracts. (D. 2, TIA/SLV Obj. 2 at 3.) The bankruptcy court requested that Delta select representative TIA and IT claims as "test cases" to be litigated first. (Ibid.). Delta thereafter filed and set for joint hearing TIA/SLV Objection 1, with respect to TIA claims filed by DFO Partners, and TIA/SLV Objection 2, with respect to Northwestern Mutual's TIA Claims. Delta also filed three more "test case" objections.[10] The five "test case" objections are described therein by Delta as reflecting five basic categories of contractual variations, into which the 43 or so separate TIA/SLV Objections (affecting more than 150 aircraft) could be grouped for purposes of analysis.[11]

All of the TIA/SLV Objections asserted two grounds for disallowance of the TIAs. The first essentially reiterated the blanket "overlap" objection previously withdrawn by Delta in response to the bankruptcy court's directive. The second argued that the owner participants are

---

[10]  TIA/SLV Objection 3 (D. 5), TIA/SLV Objection 4 (D. 6), and TIA/SLV Objection 5 (D. 24), and TIA/SLV Substitute Objection 3 (filed after the designation of the record).

[11]  At least 43 separate TIA/SLV Objections have been filed, as reflected on the bankruptcy court's docket: TIA/SLV Objection 1, TIA/SLV Objection 2, TIA/SLV Objection 3, TIA/SLV Substitute Objection 3, TIA/SLV Objections 3A - 3H, TIA/SLV Objection 4, TIA/SLV Objections 4A-4B, TIA/SLV Objection 5, TIA/SLV Objections 5A - 5AA. They are too voluminous and redundant to include all of them in the record on this appeal.

barred from enforcing their TIA claims due to variants of contractual "exclusion" clauses similar to Section 6(c) of Northwestern Mutual's TIAs. Alternatively, Delta argued that the IT claims should be reduced by the corresponding TIA claim amount. In each objection, Delta quoted only a couple of provisions excerpted from the contracts at issue and did not bother to provide actual copies of the contracts themselves or any other supporting evidence. Realizing that determination of these issues with respect to TIA/SLV Objections 1 and 2 could affect all TIA and IT claimants, the bankruptcy court permitted the filing of amicus curiae briefs by interested parties. (D. 10, Verizon Resp.; D. 12, PNC Equip. Fin. Resp.; D. 32, Supp. Verizon Resp.)

TIA/SLV Objections 1 and 2 were heard together on March 30, 2007. A motion for reconsideration is still pending before the bankruptcy court as to TIA/SLV Objection 1. The remaining "test cases" and non-test-case TIA/SLV Objections are currently being litigated, with the next hearing set for November 13, 2007. Because the basic structure and substance of the contracts are essentially similar, depending upon the rationale for the decision in this appeal, the ruling of this Court may be determinative of all of the pending objections.

## 2.    The Initial Decision Below.

On May 16, 2007, the bankruptcy court issued its Decision on TIA/SLV Objections 1 and 2, overruling the objections in part and sustaining them in part. (D. 39, Decision). First, the bankruptcy court overruled Delta's general objection that the TIA and IT claims were duplicative as a matter of law, dubbing this argument the "cosmic" objection due to its lack of any apparent grounding in fact or law. (D. 39, Decision at 6-8). The bankruptcy court recognized the distinct injury suffered by Northwestern Mutual, stating that "[t]he indenture trustee and its lenders of course do not suffer any injury from adverse tax consequences." (D. 39, Decision at 7). The bankruptcy court viewed the controlling question as what had Delta, in fact, agreed to pay as damages according to the terms of the operative contracts:

> Delta made an agreement to pay what it agreed to pay to the owner participant under the TIA. Delta also made a separate agreement requiring it to pay SLV under the Lease knowing that the Lease would be assigned to the indenture trustee as collateral security for the owner trustee's debt to the lenders. Each agreement was freely negotiated and fully supported by fair consideration on both sides. If a component of the SLV [IT] claim under the Lease is calculated by reference to the

8

owner participant's tax consequences which are indemnified under the TIA (the "overlap" Delta objects to), so be it.  That is what Delta agreed to and what both the owner participant and the indenture trustee relied upon in negotiating the agreements.  **If Delta has contracted to pay duplicative claims, then it must pay both – it cannot repudiate its duty to party A under contract A by asserting that it contracted to pay the same amount to party B under contract B.**

(D. 39, Decision at 8) (emphasis supplied).  This holding should be affirmed.

On the contract interpretation issues, the court disallowed Northwestern Mutual's TIA Claims as to the two MD-11s (the "MD-11 Claims") but allowed its Boeing 767 claim (the "N182DN Claim").   The Decision concluded that the parties intended that payment in "bankruptcy dollars" – that is, a distribution of only a fraction of the allowed claim – would qualify as sufficient "payment" of SLV within the meaning of the Section 6(c) defense, even though the Operative Documents require payment in full in cash.

Surprisingly, in making this ruling, the bankruptcy court did not read or rely upon the actual language of Northwestern Mutual's TIAs.   Instead, it relied on language from the TIA/SLV Objection 1 TIAs.  Even though copies of the Operative Documents had been properly authenticated and filed by Northwestern Mutual, for some unknown reason, the bankruptcy court utterly overlooked Northwestern Mutual's evidence and proceeded to "interpret" contracts that it admittedly had not read.  (D. 39, Decision at 14 n.3).  The linchpin of the bankruptcy court's analysis was, in fact, language from DFO Partner's Tax Indemnity Agreement that referred to "bankruptcy [or] other proceedings for the relief of debtors" – language that does **not** appear anywhere in Northwestern Mutual's TIAs. [12]  (D. 39, Decision at 14).

**3.    The Court Invites Motions for Reconsideration.**

The court immediately had second thoughts about its own ruling and took the highly unusual step of *sua sponte* convening a conference to discuss whether the Decision was accurate and covered all of the issues.  (D. 40, Notice of Tel. Conf.).   During the hearing, the court

---

[12]   Northwestern Mutual is not, of course, a party to any of DFO Partners' TIAs, and language found in another claimant's contracts cannot constitute evidence of Northwestern Mutual's own intentions or contemplations.

acknowledged that it had not read Northwestern Mutual's contracts.  (D. 41, Tr. of May 21 Tel. Conf. at 11).  Given this and other apparent mistakes in the Decision, the court invited motions for reconsideration, limited to the contract interpretation issues.  (Id. at 56).

On July 10, 2007, the court announced its rulings on the cross-motions for reconsideration.  Brushing aside its failure to read the Northwestern Mutual's Operative Documents before issuing the initial Decision, the bankruptcy court stated that the absence of any reference to "bankruptcy" in the Northwestern Mutual TIAs did not change its opinion with respect to the MD-11 Claims because mentions of "bankruptcy" in other Operative Documents must have meant that the parties drafted the contracts in "contemplation of bankruptcy" with the intention that requirements such as payment "in U.S. Dollars and in immediately available funds" (Lease §3(d) at 17) would be read entirely out of the TIAs in the bankruptcy claims allowance process.  (D. 45, Tr. of July 10 Tel. Conf. at 12-13).  Admitting to a misunderstanding of the parties' arguments on the N182DN Claim (id. at 9), the bankruptcy court reversed its prior ruling thereon, again adopting a "bankruptcy context" rule of interpretation.  The result: TIA/SLV Objection 2 was sustained and all three TIA Claims were disallowed.  (D. 46, Disallowance Order).

On July 27, 2007, Northwestern Mutual timely filed its appeal from the rulings with respect to the contract interpretation issues.  (D. 47, Northwestern Appeal).  Delta filed a notice of appeal with respect to the overruled "cosmic" objection.  (CD. 6, Delta Appeal).   On August 1, 2007, Delta filed a separate "cross appeal" from the adverse ruling on the "cosmic" objection, which appeal was withdrawn on September 10, 2007.  (CD. 7, Delta Cross Appeal).

### THE OPERATIVE DOCUMENTS

The facts of the contracts – i.e., their operative existence and the words used – are not disputed.  Copies of the agreements relating to the N803DN leveraged lease transaction were properly authenticated and offered in evidence by Northwestern Mutual.  (D. 13, Stevens Decl., Ex. Nos. 1-8).

1.    **Provisions Governing Delta's Liability Under the TIAs.**

It is undisputed that Delta's defaults under the Operative Documents and the resulting foreclosure transactions with respect to the aircraft were Triggering Events resulting in Losses for Northwestern Mutual, as defined under the TIAs, thereby giving rise to the right to indemnification.  Section 5 of the TIAs provides in relevant part as follows:

> Indemnities to Owner Participant.  (a) Payments by Lessee for Losses.  If, (A) as the result of . . . (iv) any foreclosure on or against any Lessee Person [Delta] , the Aircraft, any Engine or any Part thereof or the exercise of remedies under Section 15 of the Lease or any exercise of  any remedies by . . . the Indenture Trustee . . . resulting from a breach by any Lessee of any obligation under the Operative Documents, . . . or (vi) an event giving rise to the Lessee's obligation to pay Stipulated Loss Value or Termination Value  . . ., the Owner Participant [Northwestern Mutual] . . . shall be required to recapture all or any portion of the MACRS Deductions, the Interest Deductions or the Amortization Deductions, or (B) [not applicable] . . . (any event set forth in clause (A) or (B) being hereinafter referred to as a "Loss"), then the Lessee shall pay to the Owner Participant as an indemnity [the TIA amount as set forth in this agreement].

(TIA §5(a) at 11-13).   The Triggering Events under Section 5(a) are stated in the alternative.

**Two** Section 5(a) events have occurred here:  (i) the event described in Section 5(a)(iv), *i.e.,* foreclosure, **and** (ii) the event described in Section 5(a)(vi), *i.e.,* assertion of an "SLV" claim. Northwestern Mutual's Losses result directly from the foreclosure-related dispositions of the three aircraft that required the recapture of its MACRS Deductions (as defined in the TIAs), not from a demand for or payment of SLV.  The foreclosures are sufficient in and of themselves to support a claim for indemnification under Section 5(a)(iv).

Despite the undisputed Losses, Delta relies upon one "exclusion" clause of the TIA to attempt to defeat the TIA Claims:

> Exclusions.  Notwithstanding any provision to the contrary contained in Section 5 hereof, the Owner Participant shall not be entitled to any payment under Section 5 hereof in respect of any Loss . . . arising as a result of one or more of the following events:
> * * *
>
> (c)  Any event whereby the Lessee pays Stipulated Loss Value or Termination Value or an amount determined by reference thereto, . . ..

(TIA §6(c) at 17).[13]    This exclusion directly relates back to the "event" specified in Section 5(a)(vi):  "an event giving rise to the Lessee's obligation to pay Stipulated Loss Value." But it does not expressly "exclude" or negate Delta's indemnification liability for Northwestern's foreclosure-related Losses arising under Section 5(a)(iv).

The crucial question is what does it mean to "pay SLV" within the meaning of Section 6(c)?  The Operative Documents specifically answer this question as to both the SLV amount that must be paid and the method of payment.  First, a table of "Stipulated Loss Values" is set forth in Exhibit C to the Lease (and is also attached as Exhibit A to the TIA), consisting of a list of percentages of "Lessor's Cost" applicable as of particular dates.  If Delta's defaults result in termination of the Lease, Delta "shall pay to Lessor . . . as liquidated damages" (i) the SLV amount from the table less any net proceeds from a foreclosure sale of the aircraft, and (ii) any past due rent and certain other amounts.  (Lease §15(d) at 60-61).  Second, the Operative Documents also specify the method of making payments.  Payments due under the Lease, including payments of SLV, are governed by Section 3(d) of the Lease:

> Manner of Making Payments. . . . All payments pursuant to this Lease shall be received by 12:00 noon Eastern Standard (or Daylight) Time on the date payment is due **in U.S. Dollars and in immediately available funds**.

(Lease §3(d) at 17; emphasis supplied).  Similarly, Section 12 of the TIA requires all payments thereunder to be made in U.S. dollars:

> Payments. . . . Payments made by the Lessee or the Owner Participant pursuant to this Indemnity Agreement shall be made **in United States dollars** by wire transfer of immediately available funds . . . .

(TIA §12 at 28; emphasis supplied).  Parallel payment provisions apply to payments under each of the Operative Documents.  Nothing in the Operative Documents authorizes the substitution of "in kind" payments for "U.S. dollars."

How much of the SLV amount must be paid by Delta for the Section 6(c) defense to be satisfied?  The Operative Documents answer this question, too:  the full amount must be paid.

---

[13]  The parties all agree that, under the circumstances here, the issue is payment of "Stipulated Loss Value," not "Termination Value."  (Lease §1 at 13-14).

For the MD-11s, the total damages owed by Delta are determined by reference to the SLV amount as adjusted by deducting the net foreclosure sale proceeds. (Lease §15(d) at 60-61). Thus, the Indenture Trustee's IT Claim for N803DE started with the SLV amount calculated from Exhibit C to the Lease ($93.6 million) and subtracted the net sale proceeds from the foreclosure ($34.1 million), yielding $59.5 million as the adjusted SLV. (D. 30, Fenning Decl., Ex. 6, BNY Claim at 3.) Thus, according to BNY's calculations for N803DE, payment of "full" SLV minus foreclosure proceeds equals $59 million in cash. This amount would cover the debt, leaving a balance for distribution under the Indenture "waterfall" to Northwestern Mutual, which is entitled to all amounts payable under the Lease after the debt is satisfied from the Lease collateral. (Indenture §3.03 at 40-42). However, Delta will not be paying $59 million in cash. Instead, it is likely to distribute to creditors less than 50% of the value of their claims (based upon its current stock prices), which would be worth at most $29.75 million of the $59 million total SLV, leaving a shortfall of $29.75 million. The same $29.75 million shortfall exists for N804DE, the other MD-11. The aggregate shortfall for all three aircraft is at least $75-85 million.[14] Not coincidentally, Northwestern Mutual's TIA Claims total $85 million in the aggregate. The "full payment" contractual condition of Section 6(c) has obviously not been satisfied in fact.

The parties' intention that Northwestern Mutual receive the full and true economic benefits for which it bargained <u>before</u> the Section 6(c) defense becomes operative is underscored by Delta's express agreement that, separate and apart from all Lease remedies enforceable by the Indenture Trustee upon Delta's breach:

> In addition, Lessee [Delta] shall be liable for . . . all amounts payable by Lessee under the Participation Agreement and the Indemnity Agreement [the TIA] before or after any termination hereof. . . .

(Lease §15 at 62.) Delta also expressly agreed that its obligations under the TIAs would survive termination of the Lease until all TIA obligations are "paid in full." Section 10 of the TIA states:

---

[14] Because the Term Sheet Claim is not calculated using any of the contractual formulas, an estimated range is used here.

> The obligations and liabilities . . . arising under this Indemnity Agreement shall continue in full force and effect, notwithstanding the expiration or other termination of the Operative Documents, **until all such obligations have been met and such liabilities have been paid <u>in full</u>**.

(TIA §10 at 27; emphasis supplied). Thus, pursuant to the Operative Documents, Northwestern Mutual is entitled to enforce its TIA Claims against Delta unless its tax Losses have been paid via full payment of the entire SLV amount.

2.    **Northwestern Mutual's Exclusive Right to the Tax Benefits and any Indemnity for the Loss Thereof.**

As a matter of tax law, only Northwestern Mutual, the aircrafts' beneficial owner, can claim the tax benefits of accelerated depreciation that constitute a substantial component of the consideration for Northwestern's investment in this deal. Accordingly, the Operative Documents grant Northwestern Mutual the exclusive right to receive and enforce indemnification under the TIAs. These rights are expressly excluded from the collateral pledged to the Indenture Trustee.

This carve-out is reflected in numerous provisions of the Operative Documents. Northwestern Mutual's rights to receive payment for these indemnification rights are defined as "Excepted Payments" in the Indenture (Indenture §1 at 9) and are specifically carved out of the collateral assigned to the Indenture Trustee. (Indenture Granting Clause at 3). The Indenture also excludes TIA rights, as Excepted Payments, from the Indenture Trustee's enforcement rights. (Indenture Habendum Clause at 5-6). Similar provisions requiring Delta to pay "Excepted Payments" under the TIA to Northwestern Mutual instead of the Indenture Trustee track through all of the Operative Documents: (i) under the Lease, payments <u>other than</u> the "Excepted Payments" go to the Lessor (Lease §3(d) at 17); (ii) the Participation Agreement incorporates these payment provisions, including the "Excepted Payments," as set forth in the Lease (Participation Agreement §9 at 56); and (iii) the TIA requires that all payments by the Lessee under the TIA "shall be made directly . . . to the Owner Participant and no such payment shall constitute part of the Trust Estate or the Indenture Estate." (TIA §12 at 28).

That the underlying agreements are structured in this manner makes economic sense. Retaining the tax indemnification rights assured Northwestern Mutual of the opportunity for

returns commensurate with the risk it was taking that it would not receive the expected tax benefits and the return on its 20% equity investment. Absent these tax benefits, it would have insisted on a <u>higher</u> rate of return than that of a traditional secured lender, rather than accepting a <u>lower</u> rate of return. Thus, the Indenture, the Lease, the Participation Agreement and the TIA all expressly grant Northwestern Mutual – not the Indenture Trustee – separate and exclusive rights to enforce and recover any tax indemnification payments owed by Delta.

### ARGUMENT AND AUTHORITIES

A venerable line of United States Supreme Court case law has established the black-letter-law principle that governs this case: claims based on the terms of enforceable, state-law-governed contracts must be allowed in bankruptcy cases, absent a provision of the Bankruptcy Code expressly requiring their disallowance. This principle was reiterated most recently by the Supreme Court in <u>Travelers</u>, which was decided while this matter was pending below. Delta has not identified any Code provision justifying disallowance of Northwestern Mutual's TIA Claims. Therefore, the TIA Claims must be allowed unless Delta would have had a valid defense to liability under state law contract interpretation. Because Delta's purported Section 6(c) defense is not valid under state law, it is not valid here. This basic principle is at the heart of this appeal.

The bankruptcy court erred in interpreting the TIAs through the lens of "the context of bankruptcy" (D. 39, Decision at 14), thereby nullifying Northwestern Mutual's bargained-for rights under the TIAs. The TIA Claims are fully enforceable under state law because no state court would ever conclude that the parties intended that a 50% payment of SLV in the form of "bankruptcy dollars"-worth of Delta stock – a shortfall of $75-85 million – would satisfy the Section 6(c) requirements that the full amount of SLV be paid in cash before Delta will be relieved of its TIA obligations.

### I.    The Lower Court's "Bankruptcy Context" Rule of Contract Interpretation Contradicts Supreme Court Precedent.

The bankruptcy court's approach to contract interpretation in this case improperly conflates two separate and entirely distinct issues: (1) the claims <u>allowance</u> question, *i.e.*, whether Northwestern Mutual has a "claim" that "shall" be allowed pursuant to 11 U.S.C. §

502(a) because it has a "right to payment" and an "enforceable obligation" under applicable state law; and (2) the claims discharge question, *i.e.*, how much Delta must pay in order to discharge Northwestern Mutual's state-law-determined claim amounts under its plan of reorganization. Absent some specific Bankruptcy Code provision barring allowance of the TIA claims – none of which has been argued here – only the discharge issue, not the allowance issue, is a matter of bankruptcy law. Whether Delta is liable on the TIA Claims depends upon whether it has proven a valid defense within the four corners of the Operative Documents. In contrast, whether Delta may discharge the TIA or IT Claims after they have been allowed by paying 50¢ "bankruptcy dollars" is not properly before the court on the claims allowance question.

The bankruptcy court disregarded the Operative Documents' express requirements that payment of the full SLV amount in cash was the necessary prerequisite for Delta to establish a contractual Section 6(c) defense to Northwestern Mutual's TIA Claims. Instead, the court accepted Delta's argument that, merely because it had filed bankruptcy, it could rewrite those contractual provisions to avail itself of that defense even though it would only be paying only about 50% of the SLV amount in new Delta stock, not cash. In so ruling, the bankruptcy court imposed its version of a special "bankruptcy" rule of contract interpretation, stating**:**

> The word "pays" and the phrase "or an amount determined by reference thereto" **must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy**, which the parties expressly contemplated in the TIA, as well as in the other agreements. There is rarely likely to be full payment of claims in bankruptcy, and in the ordinary course of any Chapter 11 case payment of claims under a plan may be in cash or equity or debt securities of the debtor or a combination of cash and securities.

(D. 39, Decision at 14) (emphasis supplied). This ruling is directly contrary to controlling Supreme Court precedent, as set forth in Travelers.

Before the Supreme Court in that case was a claim for attorneys' fees incurred during the chapter 11 case. The lower courts all rejected Travelers' claim, holding that "issues 'peculiar to federal bankruptcy law'" trumped Travelers' otherwise enforceable state law "attorneys' fees" contract provision governing damages. The Supreme Court reversed, stating:

> [W]e have long recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the

determination of property rights in the assets of a bankrupt's estate to state law.'" Accordingly, when the Bankruptcy Code uses the word "claim" – which the Code itself defines as a "right to payment," – it is usually referring to a right to payment recognized under state law.  As we stated in Butner, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, **there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.**"

Travelers, 127 S.Ct. at 1205 (quoting 11 U.S.C. §101(5)(a) and Butner v. United States, 440 U.S. 48, 55 (1979); and citing Vanston Bondholders Protective Comm.. v. Green, 329 U.S. 156, 161 (1946)) (emphasis supplied).

The Supreme Court struck down the lower courts' imposition of bankruptcy "context" or "peculiar" bankruptcy considerations, in favor of a straightforward state-law contract interpretation analysis:

> In rejecting Travelers' claim for contractual attorney's fees, the Court of Appeals did not conclude that the claim was "unenforceable" under §502(b)(1) as a matter of applicable nonbankruptcy law.  Nor did it conclude that Travelers' claim was rendered unenforceable by any provision of the Bankruptcy Code .
>
> * * *
>
> The absence of textual support is fatal for the [so-called Fobian rule – which dictates that "attorney fees are not recoverable in bankruptcy for litigating issues 'peculiar to federal bankruptcy law.'" ]  Consistent with our prior statements regarding creditors' entitlements in bankruptcy, we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed.  11 U.S.C. §502(b).  Neither the court below nor PG&E has offered any reason why the fact that the attorney's fees in this case were incurred litigating issues of federal bankruptcy law overcomes that presumption.

Id. at 1205-06 (emphasis added) (citations omitted).

Travelers was decided shortly before the hearing on reconsideration.  The bankruptcy court dismissed the decision as irrelevant but failed to offer any authority or explanation as to why Delta's bankruptcy status should alter the proper method of interpreting the contractual Section 6(c) defense under state-law standards here.  The bankruptcy court simply declared that parties are presumed to have known that Delta could pay its debts in "bankruptcy dollars" under a plan of reorganization.  While admitting that the Decision had quoted and relied upon the wrong contracts – i.e., DFO Partners' TIAs at issue in TIA/SLV Objection 1 – the bankruptcy court's only further textual interpretation of Northwestern Mutual's actual Operative Documents

17

consisted of listing every time the word "bankruptcy" was mentioned. The court acknowledged, however, that the word "bankruptcy" does not appear anywhere in Northwestern Mutual's TIAs. (D. 45, Tr. of July 10 Tel. Conf. at 12-13).

From these references to "bankruptcy" in other contracts, the bankruptcy court leaped to the conclusion that, in Section 6(c) of the TIAs,

> [t]he word "pays" and the phrase "or an amount determined by reference thereto" must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy, **which the parties expressly contemplated in the TIA**, as well as in the other agreements.

(D. 39, Decision at 14) (emphasis supplied); see also (D. 45, Tr. of July 10 Tel. Conf. at 12-13). This "hunting for the b-word" approach to contract interpretation would effectively override all contract terms specifying the form and amount of payment in determining rights and obligations among the parties to complex interrelated contracts, if any party files for bankruptcy. Under the bankruptcy court's theory, all contracting parties are presumptively on notice that all contract terms are subject to being interpreted differently in the "bankruptcy context." This view of contract interpretation has been forcefully repudiated by the Travelers and Butner line of cases.

## II.    Application of State Law, Pursuant to Travelers, Requires Allowance of Northwestern Mutual's TIA Claims.

In determining Delta's liability under the TIAs, the bankruptcy court in effect rewrote the Operative Documents by substituting "pay in bankruptcy dollars in the form of common stock" in the place of "pay in U.S. dollars in immediately available funds" wherever the method and form of payment is specified. This approach to determining the validity of a contractual defense contradicts applicable state law governing the Operative Documents. Under New York law, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) (citing Fiore v. Fiore, 389 N.E.2d 138, 139 (N.Y. 1979) and DeVanzo v. Newark Ins. Co., 353 N.Y.S.2d 29 (N.Y. App. Div. 1974)). "Under New York law, therefore, a court must enforce that plain meaning, 'rather than rewrite an unambiguous agreement.'" Krumme v. West

Point Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000) (quoting American Express Bank Ltd. v. Uniroyal, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990)).

A.    **The Contracts Required Payment of the SLV Amount, in Full and in Cash, Before a Section 6(c) Defense is Effective.**

The Court erred in stating that Northwestern Mutual's TIAs do not require that all payments thereunder be in cash – *i.e.*, in U.S. dollars – on the grounds that, "Section 6(c) could have required payment in cash, but it does not." (D. 39, Decision at 14.) The payment referred to in Section 6(c) is payment of SLV under the Lease. Under New York law, all of the interrelated contracts involved in a single transaction must be interpreted as a whole, consistent with the purpose of the transaction. Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352 (N.Y. 2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose."). Under the Lease, Section 3(d) requires "[a]ll payments pursuant to this Lease" shall be made "in U.S. dollars and in immediately available funds." (Lease §3(d) at 17). There is nothing ambiguous about this contractual requirement. Construing the Operative Documents together, the Section 6(c) payment requirement contemplates that payment be made in U.S. dollars and in immediately available funds to satisfy this condition.

Each of the Operative Documents imposes various payment obligations on Delta and the other parties. Like the Lease, the TIAs and other contracts require that payments be made in U.S. dollars. (*See, e.g.,* TIA §12 at 28; Indenture §1 at 7). Thus, any payment owed by Delta must be made in U.S. dollars, including any SLV or any "amount determined by reference" to SLV, and any TIA-related payment. The parties did not need to include a redundant reference to payment in U.S. dollars in Section 6(c), where Lease § 3(d) and TIA §12 already so specify.

Contrary to the bankruptcy court's "bankruptcy context" theory, state law rules of contract interpretation would <u>not</u> permit a New York court to hold that payment of SLV or an amount determined by reference thereto in Delta <u>stock</u> instead of U.S. dollars would satisfy the requirements of Section 6(c) of the TIAs and justify denying Northwestern Mutual any recovery against Delta, any more than it would be permitted to substitute "payment in pesos" or "payment

in used cars" for "payment in U.S. dollars."   A court could only reach such a holding by rewriting the contracts' plain meaning, as the bankruptcy court erroneously did.

>    **B.    Partial Payment of the IT Claim Does Not Establish a Section 6(c) Defense.**

Just as Delta could not have prevailed under state law by asserting that it could demonstrate a Section 6(c) defense by paying the IT claim in Delta stock instead of U.S. dollars as required by the contracts, it could not have prevailed under state law by arguing that it should be deemed to have met the requirements of the Section 6(c) exclusion by making only a partial payment of the SLV amount, rather than the full amount due under the Operative Documents.

The bankruptcy court erred in ruling that Delta had a complete defense to liability on the TIA Claims so long as it paid **any** "amount determined by reference" to SLV.   The bankruptcy court equated "bankruptcy dollars" paid through Delta's plan with "an amount" determined "by reference" to the SLV amount, and then concluded that such a fractional payment to the Indenture Trustee gave rise to a complete defense to the TIA claim.   This makes no sense. Assume, *arguendo*, that the Indenture Trustee made a side deal with Delta to accept just 10% of its  claim.   Such a *de minimus* payment, not made in compliance with the terms of the Operative Documents, cannot constitute a complete defense to Delta's independent obligations under the TIA.   In effect, such a holding would mean that the Indenture Trustee could unilaterally waive Northwestern Mutual's rights to receive payments under the "waterfall" of Section 3.03 of the Indenture – a conclusion directly contradicted by Section 5.09 of the Indenture:

> [T]he Indenture Trustee may not, at any time, without the consent of the Owner Participant . . . grant any consent or waiver under or make any modification of the Indenture Agreement.

(Indenture §5.09 at 63).

Section 6(c) cannot be read in isolation; rather, it must be read as an integral part of the whole set of Operative Documents and as part of a transaction that was specifically designed to assure preservation of the tax benefits for which Northwestern Mutual bargained.   Those tax benefits constituted a substantial portion of the consideration for which it was willing to put up 20% of the purchase price of the aircraft in the first place.   The bankruptcy court's interpretation

thus violates two of the most fundamental principles of contract interpretation: (i) that all of the interrelated contracts involved in a single transaction must be interpreted as a whole, Westmoreland Coal Co., 100 N.Y.2d at 357 ("'A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'") (citations omitted), and (ii) that contracts must not be interpreted so as to render any provisions a nullity, RM 14 FK Corp. v. Bank One Trust Co., N.A., 831 N.Y.S.2d 120 (N.Y. App. Div. 2007) (upholding the principle that a contract should not be interpreted so as to render any clause meaningless). Here, the bankruptcy court's holding that **any** payment made on account of SLV suffices for the Section 6(c) defense has the practical effect of wholly nullifying the TIA and eviscerating Northwestern Mutual's protections under the Indenture. No court has ever so held with respect to any leveraged lease. This unprecedented ruling risks destabilizing the multi-billion dollar leveraged leasing market for all types of equipment.

The Leases specify exactly how to "determine" amounts due from Delta "by reference" to SLV; they do not leave it to guesswork. The "amount determined by reference thereto" language of Section 6(c) addresses how the scheduled SLV amount must be adjusted to account for proceeds received by the Lessor when it has opted to exercise its remedies after a Delta default, whether the proceeds come from foreclosing and selling the aircraft or re-leasing it to a third party. Under such circumstances, Delta "shall pay" liquidated damages in amount equal to the excess of the SLV over the fair market sales value or fair market rental value of the aircraft. (Lease §15 at 59-62). For example, the IT Claim for N803DE is calculated by subtracting $34 million in net foreclosure sale proceeds from the SLV number of $93.5 million pulled from Lease Schedule C. The $59.5 million qualifies as "an amount determined by reference" to SLV within the meaning of Section 6(c). If Delta paid the full $59.5 million in U.S. dollars – which of course it has not and will not – the Section 6(c) exclusion would have been satisfied by payment of "an amount determined by reference" to SLV. In other words, after a foreclosure

sale, the SLV damages make up for any shortfall when the proceeds turn out to be less than the scheduled SLV amount.

Delta argued that it is relieved of all obligations under the TIA if it pays any amount that mentions "SLV." This argument would effectively excuse Delta from its liability upon making a payment of even a *de minimus* 1% of any SLV number listed on Schedule C. Such an interpretation would render the TIA obligation wholly illusory and cannot be upheld. The Operative Documents were carefully constructed to assure Northwestern Mutual, as owner participant, of its right to retain the tax benefits for which it bargained – either under the Lease (via full payment of the SLV amount, with distribution of the tax benefit and equity portions to Northwestern Mutual) or under the TIA (pursuant to the liquidated damages formula of that contract). Under Delta's theory of "an amount by reference to," so long as it mentions SLV and pays even just $1 while referring to SLV, it automatically does not have to pay anything under the TIA. However, the situation in which the full SLV amount has not been paid is the very circumstance under which the TIA is most needed to compensate Northwestern Mutual for its tax Losses. In fact, the Operative Documents do not permit an outcome in which Northwestern Mutual is paid nothing as compensation for its tax Loss benefits.

Proper interpretation of these contracts as a whole compels the conclusion that the Section 6(c) exclusion is <u>not</u> applicable and does <u>not</u> excuse Delta from paying under the TIA <u>unless</u> it has paid the <u>full</u> amount of the SLV-based liquidated damages. The Lease explicitly makes Delta liable for "all amounts payable" under the TIA "before or after any termination of the Lease. (Lease §15 at 62). Similarly, Delta expressly agreed to remain liable under the TIA "**until all such obligations have been met and such liabilities have been paid <u>in full</u>**." (TIA §10 at 27). These provisions are rendered meaningless if Delta can evade its TIA obligations merely by paying the Indenture Trustee pursuant to some formula that mentions "SLV" as opposed to paying its full contractual obligations under the Lease. The bankruptcy court's ruling cannot be reconciled with these contractual provisions.

III.    **The Bankruptcy Court Erred in Holding That the Term Sheet Deal Satisfied the Requirements of Section 6(c).**

BNY's N182DN Claim does not mention SLV on its face.  Instead, it references the Term Sheet negotiated by Delta and the Indenture Trustee without the participation or consent of Northwestern Mutual.  As the bankruptcy court recognized, the Term Sheet formula results in a stated claim amount that is far lower than any calculation of an SLV claim that is permitted by the terms of the Operative Documents.  (D. 39, Decision at 15).  The Term Sheet formula – despite its mention of "SLV" – is not based upon any calculation of SLV authorized under the terms of the Lease.  The Term Sheet deal itself directly violates the terms of the Operative Documents, pursuant to which Delta and the Indenture Trustee are prohibited from waiving Northwestern Mutual's tax indemnification claims or squeezing out Northwestern Mutual's equity interests by cutting a bilateral side deal that allows Delta to retain the aircraft after termination of the Lease.  A negotiated damages claim resulting from a prohibited transaction – however calculated – cannot, as a matter of contract interpretation, constitute a liquidated damages claim for SLV under the terms of the Lease.

The Term Sheet deal is not among the five alternative ways in which Delta is permitted to exit from the Leases.  Three such options only apply at the end of the Lease term in 2016 (*i.e.,* Lease renewal; sale of the plane to a third party, and return of the plane to the Owner Trustee).  (Lease §5 at 21-24).  The fourth gives Delta the right to purchase the aircraft after 2011, not now.  (*Id.* at 21).  In fact, until 2011, Delta only has one contractually authorized way out of its Lease obligations:  if the aircraft qualifies as surplus equipment, Delta can sell it to a third party, subject to various conditions, including a price satisfactory to the Lessor.  Under none of these "early out" provisions is Delta allowed to retain possession of the aircraft:

> Neither Lessee nor any of its affiliates may submit a bid, nor may Lessee accept a bid from any person acting for or affiliated with Lessee or having any arrangement with Lessee regarding Lessee's purchase or continued use of the Aircraft.

(*Id.* §9 at 40).  Even if one of these "early out" options applied, Delta would not be entitled to invoke them based upon the Term Sheet deals because **the Lease prohibits Delta from**

**retaining the aircraft after a breach of the Lease**.  (Lease §15 at 59-62).  This prohibition is actually crucial to the tax-advantaged structure; otherwise, the deal could be subject to recharacterization by the federal taxing authorities, who might deem Delta to be the beneficial owner of the aircraft, thereby causing the total loss of Northwestern Mutual's bargained-for tax benefits.  Thus, read together, these provisions of the Operative Documents prohibit the type of transaction in the Term Sheet – a side deal between Delta and the Indenture Trustee for a new lease at a radically lower rent that leaves the plane in Delta's possession.  As Delta admits and as the bankruptcy court originally and correctly noted in its Decision, the Term Sheet

> references a formula agreed to by Delta and the counterparties to the Term Sheet which **results in a claim by the indenture trustee in respect of each of the covered aircraft which is not based upon any calculation authorized under the terms of the Lease.  Indeed, Delta acknowledges that the amount calculated under the Term Sheet formula is far lower than the SLV amount would be under the Lease.**  Since the indenture trustee's Term Sheet claim with respect to N182DN is not "determined by reference" to Stipulated Loss Value or Termination Value, the exclusion in Section 6(c) of the TIA does not apply.

(D. 39, Decision at 15) (emphasis supplied).  The bankruptcy court, of course, later backed away from this straightforward analysis of the N182DN Claim.  (D. 45, Tr. of July 10 Tel. Conf. at 7-9, 11-15).  Yet nothing in Delta's motion for reconsideration retracted its prior admission as to the great discrepancy between the Term Sheet formula and the SLV amount, nor changed the fact that the N182DN Claim was "not based upon any calculation authorized under the terms of the Lease."

The significant discrepancy between the calculation of SLV or "an amount calculated with reference thereto" and the N182DN Claim results from the fact that the Term Sheet formula credited Delta with a _deemed_ value, negotiated by Delta and BNY, of the proposed restructured lease deal.  Nothing in the Operative Documents entitles Delta to satisfy its SLV payment obligations by deducting such a credit, because such a deal is prohibited by the Lease.  This reduction of the purported "SLV" amount also violates Northwestern Mutual's protections against the Indenture Trustee's unilateral waiver or modification of any Indenture terms, including Section 3.03's provisions assuring Northwestern Mutual the residual value of SLV payments.  (Indenture §3.03 at 40-42, §5.09 at 63.)  The Term Sheet's use of the scheduled SLV

amount as the starting point for its mathematical calculations is not enough to bring what is obviously a compromised amount – one that is no longer based upon any calculation authorized under the terms of the Lease – within the parameters of Section 6(c) of Northwestern Mutual's TIA.

## CONCLUSION

In this case, straightforward contractual interpretation demonstrates that Delta has failed to establish its entitlement to a Section 6(c) defense because it has not and will not be paying full SLV in cash under the terms of the Operative Documents. A distribution of Delta stock worth only 50% of the SLV amount, resulting in a $75-85 million shortfall, is not the contractual equivalent. The bankruptcy court erred in reading into the contracts a special "bankruptcy context" meaning that would never apply outside of the bankruptcy courtroom. The practical result of this ruling: instead of receiving plan distributions on account of the allowed TIA Claims to which it is entitled under the Operative Documents, Northwestern Mutual will receive no compensation from Delta for the significant tax Losses it has suffered due to Delta's defaults. This unprecedented nullification of the TIAs is neither permitted by the contracts, nor by United States Supreme Court precedent. Nor is it fair under any standard. The ruling below should be reversed. The bankruptcy court should be directed to allow the TIA Claims in the appropriate amount to be determined in further proceedings below.

Dated: October 8, 2007        By:  /s/ Lisa Hill Fenning
New York, New York            Lisa Hill Fenning (LF-9016) - A*dmitted Pro Hac Vice*
                              DEWEY & LEBOEUF LLP
                              333 South Grand Avenue, 26th Floor
                              Los Angeles, California 90071-1530
                              Tel:  (213) 621-6000 / Fax:  (213) 621-6100
                              lfenning@dl.com

                              *Counsel for Appellant*
                              *The Northwestern Mutual Life Insurance Company*