**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DELTA AIR LINES, INC., et al., | : | Case No. 05-17923 (ASH) |
| | : | |
|        Reorganized Debtors. | : | (Jointly Administered) |

------------------------------------------------------------- x

| | | |
|---|---|---|
| THE NORTHWESTERN MUTUAL | : | |
| LIFE INSURANCE COMPANY | : | |
| | : | |
|        Appellant, | : | Civil Case No. 07-CV-7745(RB) |
| | : | (ECF Case) |
|    -against- | : | |
| | : | |
| DELTA AIR LINES, INC. AND THE | : | |
| POST-EFFECTIVE DATE COMMITTEE | : | |
| OF DELTA AIR LINES, INC. | : | |
| | : | |
|        Appellees. | : | |

------------------------------------------------------------- x

## RESPONSE BRIEF OF APPELLEES DELTA AIR LINES, INC. AND THE POST-EFFECTIVE DATE COMMITTEE

| | |
|---|---|
| STROOCK & STROOCK & LAVAN LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
| Lawrence M. Handelsman (LH-6957) | Daniel H. Golden (DG 5624) |
| Kristopher M. Hansen (KH-4679) | David H. Botter (DB 2300) |
| Jayme T. Goldstein (JG-9054) | Mitchell P. Hurley (MH 0740) |
| 180 Maiden Lane | 590 Madison Avenue |
| New York, New York 10038 | New York, New York 10022 |
| Telephone: (212) 806-5400 | Telephone: (212) 872-1000 |
| Facsimile: (212) 806-6006 | Facsimile: (212) 872-1002 |
| | |
| *Counsel for Delta Air Lines, Inc* | *Counsel for the Post-Effective Date Committee* |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF BASIS OF APPELLATE JURISDICTION ....................................... 4

STATEMENT OF ISSUES PRESENTED ........................................................................ 4

APPLICABLE STANDARD OF APPELLATE REVIEW ............................................. 5

STATEMENTS OF THE CASE AND FACTS ............................................................... 5

      A.     The Chapter 11 Cases ...................................................................... 5

      B.     General Background Regarding Leveraged Leases .................................. 6

      C.     The Northwestern Transactions ...................................................... 8

      D.     TIA/SLV Objection 2 And The Decision ........................................... 11

      E.     Motions For Reconsideration And July 18 Order ................................. 15

      F.     Appeals From The July 18 Order ..................................................... 18

ARGUMENT AND ANALYSIS ..................................................................................... 19

I.     THE BANKRUPTCY COURT CORRECTLY DISALLOWED THE
      NORTHWESTERN TIA CLAIMS BASED ON THE LANGUAGE OF THE
      PARTIES' CONTRACTS ....................................................................... 19

      A.     Judge Gropper's Recent Northwest Airlines Decision Supports the
            Bankruptcy Court's Decision and Ruling on the Motions For
            Reconsideration ...................................................................... 19

      B.     The Bankruptcy Court Correctly Held That the Exclusion in Section 6(c)
            of the TIAs Does Not Require Payment "In Cash" ................................. 22

      C.     The Bankruptcy Court Correctly Held That the Exclusion in Section 6(c)
            of the TIAs Does Not Require Payment "In Full" ................................. 26

      D.     The Bankruptcy Court's Rulings Are Fully Consistent With the Travelers
            Decision ............................................................................... 28

      E.     Northwestern's Other Contract Arguments Were Not Presented to the
            Bankruptcy Court and Cannot be Raised for the First Time on Appeal, and
            in any Event are Without Merit ..................................................... 31

i

F.      Claim No. 5335 was Calculated in Accordance With, and Will Receive a Distribution "Determined by Reference" To, SLV ................................................ 32

II.    REGARDLESS OF THE CONTRACTUAL TERMS OF THE OPERATIVE DOCUMENTS, THE LAW REQUIRES DISALLOWANCE OF DUPLICATIVE CLAIMS TO THE EXTENT OF THE OVERLAP ......................................................... 37

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

805 Third Avenue Co. v. M.W. Realty Associates,
    58 N.Y.2d 447 (1983) ........................................................................................24

425 Fifth Avenue Realty Associates v. Yeshiva University,
    228 A.D.2d 178 (1st Dep't 1996) .....................................................................24

Adarand Constructors, Inc. v. Moneta,
    534 U.S. 103 (2001) ..........................................................................................31

Allianz Insurance Co. v. Lerner,
    416 F.3d 109 (2d Cir. 2005) ..............................................................................31

In re Ames Department Stores, Inc.,
    No. 93 Civ. 4014, 1995 WL 311764 (S.D.N.Y. May 18, 1995) .......................27

In re Bennett Funding Group, Inc.,
    146 F.3d 136 (2d Cir. 1998) ................................................................................5

In re Chateaugay Corp.,
    115 B.R. 760 (Bankr. S.D.N.Y. 1990), aff'd, 130 B.R. 690 (S.D.N.Y. 1991),
    vacated by agreement of the parties, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL
    388809 (S.D.N.Y. June 16, 1993) ...............................................................39, 40

Diversified Graphics, Ltd. v. Groves,
    868 F.2d 293 (8th Cir. 1989) ............................................................................38

In re Drexel Burnham Lambert Group,
    138 B.R. 687 (Bankr. S.D.N.Y. 1992) .............................................................27

In re Enron Corp.,
    364 B.R. 482 (S.D.N.Y. 2007) ...........................................................................5

In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,
    160 B.R. 882 (Bankr. S.D.N.Y. 1993) ..................................................... passim

In re Fobian,
    951 F.2d 1149 (9th Cir. 1991) ..........................................................................29

In re Hexcel Corp.,
    174 B.R. 807 (Bankr. N.D. Cal. 1994) .............................................................44

In the Matter of Brinke Transportation, Inc.,
    No. 87-03785, 1989 WL 233147 (Bankr. D.N.J. Jan. 23, 1989) .......................40

Paese v. Hartford Life Accident Insurance Co.,
    449 F.3d 435 (2d Cir. 2006).................................................................................31

Raleigh v. Illinois Department of Revenue,
    530 U.S. 15 (2000)....................................................................................29, 30

Schmidt v. Magnetic Head Corp.,
    97 A.D.2d 151 (2d Dep't 1983)..................................................................24

In re Simetco, Inc.,
    No. 93-61772, 1996 WL 651001 (Bankr. N.D. Ohio Feb. 15, 1996)...............39

In re T.R. Acquisition Corp.,
    309 B.R. 830 (S.D.N.Y. 2003)....................................................................40

Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,
    127 S. Ct. 1199 (2007)........................................................................ *passim*

In re Vebeliunas,
    332 F.3d 85 (2d Cir. 2003)..........................................................................5

## STATUTES

11 U.S.C. § 101(5) .........................................................................................4, 38, 43

11 U.S.C. § 1129 ...........................................................................................27, 30

11 U.S.C. § 1141(d) .......................................................................................28, 30

11 U.S.C. § 502(b) .............................................................................................29

11 U.S.C. § 502(e) .............................................................................................44

11  U.S.C. § 524(a) .......................................................................................27, 30

28 U.S.C. § 158(a)(1).............................................................................................4

I.R.C. § 671......................................................................................................41

Rev. Rul. 57-390, 1957-2 C.B. 326 .....................................................................41

Rev. Rul. 85-13, 1985-1 C.B. 184 ......................................................................41

Treas. Reg. § 1.671-3(a)(1)..................................................................................41

S. Rep. No. 95-989 (1978), as reprinted in  1978 U.S.C.C.A.N. 5787........................44

H.R. Rep. No. 95-595 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963......................44

**MISCELLANEOUS**

BLACK'S LAW DICTIONARY 1165 (8th ed. 2004) ........................................................................41

Jay Lawrence Westbrook, <u>A Functional Analysis of Executory Contracts</u>,
      74 Minn. L. Rev. 227 (1989) ...........................................................................................27

Delta Air Lines Inc. ("Delta") and the Post Effective Date Committee (the "Committee" and together with Delta, the "Appellees") hereby submit this brief (1) in response to the opening brief (the "Appellant's Brief") filed by Northwestern Mutual Life Insurance Company ("Northwestern" or the "Appellant") in support of its appeal (the "Appeal") taken from the Order with Respect to TIA/SLV Objection 2 (the "July 18 Order"), which was entered by the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on July 18, 2007 [Appellant's Designation Nos. 46], and (2) in support of the Appellees' cross-appeal (the "Cross-Appeal") from the July 18 Order.

## PRELIMINARY STATEMENT

This appeal arises out of tax-driven "leveraged lease" financings for a number of aircraft.  In connection with the relevant financings, Delta entered into leases (the "Leases"), each of which provided for the payment of a calculated amount known as "Stipulated Loss Value" ("SLV") in the event of a default.  Delta also entered into "Indemnity Agreements" in connection with the transactions (referred to as "Tax Indemnity Agreements" or "TIAs"), under which Delta agreed to compensate Northwestern if Northwestern incurred certain tax losses.

Some events that give rise to claims under the TIAs ("TIA Claims") also are events of default under the Leases, which give rise to claims to recover SLV ("SLV Claims").  Northwestern acknowledged, before the Bankruptcy Court, that the calculation of SLV includes an amount that is intended to provide compensation for the potential tax losses that Northwestern might incur in connection with a default and foreclosure.  See "Response of The Northwestern Mutual Insurance Company To TIA/SLV Objection 2," dated March 22, 2007 (the "Northwestern Response") [Appellant's Designation No. 12] at 16-17 (acknowledging that the calculation of SLV includes an amount "sufficient to compensate it [Northwestern] for the

acceleration of taxable income resulting from the early termination of the Lease").    In this

respect, SLV Claims and TIA Claims are duplicative of each other: they seek compensation for

the same tax loss incurred by one party (Northwestern) in connection with a default and the

termination of Northwestern's interests in an aircraft.  The TIAs to which Northwestern is a party

address that potential duplication, and eliminate it, by providing that Northwestern is not entitled

to a TIA Claim if its tax loss arises as a result of "[a]ny event whereby the Lessee pays

Stipulated Loss Value or Termination Value or an amount determined by reference thereto . . .".

See TIA at 16 (emphasis added).[1]

       In Delta's bankruptcy case, SLV Claims were asserted by The Bank of New York

("BNY") in its capacity as indenture trustee in each of the leveraged lease transactions to which

Northwestern was a party.  Delta has agreed, in each of those transactions, to the allowance of

those claims (which are calculated "by reference to" SLV).  The Bankruptcy Court (Judge

Hardin) held, under the plain language of the parties' TIAs, that BNY's SLV Claims act as a bar

to Northwestern's TIA Claims, and for that reason he disallowed Northwestern's TIA Claims.

       Northwestern's arguments on Appeal from Judge Hardin's rulings are without

merit.    Northwestern first contends that the Bankruptcy Court impermissibly "rewrote" the

parties' agreements and applied to them a non-existent "bankruptcy context" rule of contract

interpretation rather than ordinary New York state contract law, in contravention of the Supreme

Court's recent holding in Travelers Casualty & Surety Co. of America v. Pacific Gas & Elec.

Co., 127 S. Ct. 1199 (2007).  The Bankruptcy Court did no such thing.  As the Bankruptcy Court

itself explained in detail when it denied Northwestern's motion for reconsideration of its May 16,

---

[1]    As stated in the Appellant's Brief, Appellees and Appellant have agreed to use the Operative Documents (as defined herein) for Tail No. N803DE for purposes of language references in the Appeal.  See Appellant's Brief at 2.

2007 Decision on TIA/SLV Objections 1 and 2 (the "<u>Decision</u>"), the Decision was based on: (i) explicit provisions of the Bankruptcy Code; and (ii) ordinary rules of contract construction, and was therefore fully consistent with the <u>Travelers</u> decision.  <u>See</u> "Transcript of Telephone Conference," July 10, 2007 [Appellant's Designation No. 45] at 8-15.

Second, Northwestern argues that the exclusion in its TIAs does not apply – and that Northwestern may continue to assert its duplicative TIA Claims – unless BNY's SLV Claims are paid "in full, in cash."  In this regard, it is Northwestern who is trying to rewrite the terms of the parties' agreements.  The words "in full, in cash" do not appear in the relevant sections of the TIAs.  To the contrary, those agreements explicitly provide that TIA Claims are barred in "any" event whereby Delta pays SLV "or an amount determined by reference thereto."

Third, Northwestern contends that the SLV Claim asserted by BNY with respect to one of Northwestern's transactions (Tail No. N182DN) allegedly does not really constitute a claim for SLV or an "amount determined by reference thereto."  This argument is based on Northwestern's contention that the Lease for that transaction allegedly forbids the particular way in which the lenders have elected to exercise remedies.  Northwestern's contention is flatly contrary to the plain language of the parties' agreements and the terms of the settlement to which Delta has agreed pursuant to its modified restructuring term sheet dated February 15, 2006 (the "<u>Bingham Term Sheet</u>").

Northwestern has had **<u>two</u>** attempts to convince the Bankruptcy Court of the validity of its arguments – through its (a) filed response to TIA/SLV Objection 2 (and the oral argument at  the hearing on the objection) and (b) motion for reconsideration of the Decision.  However, Northwestern was correctly unsuccessful both times.  For the reasons stated above, Northwestern's Appeal should again be denied.

3

Alternatively, Delta's and the Committee's Cross-Appeal should be granted. Delta and the Committee argued before the Bankruptcy Court that a single loss (here, Northwestern's alleged tax losses) can give rise to only a single "right to payment" and that, under the Bankruptcy Code, only a single claim can be allowed with respect to such losses. See 11 U.S.C. § 101(5) (defining a "claim" as a "right to payment"). Since the parties have admitted that TIA Claims and SLV Claims are duplicative of each other, only one such claim can be allowed, and this is true regardless of whether the parties' underlying contracts explicitly dealt with the overlaps among the claims. In these cases, it is clear from the parties' agreements that BNY's SLV Claims (which Northwestern had pledged to certain lenders) should be given priority, and that Northwestern's TIA Claims were therefore properly disallowed.

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction over the Appeal and the Cross-Appeal pursuant to 28 U.S.C. § 158(a)(1) and Rule 8001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The July 18 Order is a final, appealable order. See 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED

1.      Whether the Court should deny Northwestern's Appeal on the ground that the Bankruptcy Court correctly held that Northwestern's TIA Claims were barred by the terms of Northwestern's TIAs, which bar any TIA Claims arising from events pursuant to which Delta pays "Stipulated Loss Value or an amount determined by reference thereto."

2.      Whether the Bankruptcy Court erred as a matter of law in failing to grant Delta's and the Committee's TIA/SLV Objection 2 with respect to Northwestern's TIA Claims on the ground that (a) Northwestern's TIA Claims and BNY's SLV Claims admittedly overlap and seek compensation for the same tax loss incurred by Northwestern, and (b) the allowance of

4

both of those claims would impermissibly result in multiple claims allowances for a single alleged loss.

## APPLICABLE STANDARD OF APPELLATE REVIEW

On appeal, a federal district court reviewing an order of the bankruptcy court accepts its factual findings unless they are clearly erroneous, pursuant to Bankruptcy Rule 8013, and reviews its conclusions of law *de novo*. See, e.g., In re Enron Corp., 364 B.R. 482, 485 (S.D.N.Y. 2007) (citing In re AroChem Corp., 176 F.3d 610, 620 (2d Cir. 1999)); In re Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Bennett Funding Group, Inc., 146 F.3d 136, 138 (2d Cir. 1998).

## STATEMENTS OF THE CASE AND FACTS

Many of Northwestern's arguments on Appeal are based on gross mischaracterizations of the admitted facts and of the grounds for the Bankruptcy Court's decision. For this reason, it is important to review the proceedings below (and the parties' contentions below) in detail.

**A.**     ***The Chapter 11 Cases***

On September 14, 2005, Delta and certain of its subsidiaries (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (the "Chapter 11 Cases"). On April 25, 2007, the Bankruptcy Court entered an order confirming the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"). [The Bank of New York's Designation No. 4]. On April 30, 2007, the Plan became effective and the Debtors emerged from chapter 11 as Reorganized Debtors.

Pursuant to the Plan, the Committee was created and, with respect to the court proceedings described in Section 17.5(d) of the Plan**,** deemed successor-in-interest to the Official Committee of Unsecured Creditors (the "Official Committee"), which had been appointed by the United States Trustee on September 28, 2005 pursuant to section 1102 of the Bankruptcy Code.

**B.**    *General Background Regarding Leveraged Leases*

Prior to the filing of its chapter 11 case, Delta entered into leveraged lease financing transactions for certain aircraft (*i.e.,* "Tails").  The parties agreed below that a typical leveraged lease transaction includes the following components:

(a) The parties enter into a master agreement (called a "Participation Agreement") that, among other things, specifies the roles of the parties and identifies the other agreements that are to be executed.

(b) A trust (the "Owner Trust") obtains ownership of one or more aircraft.  The Owner Trust finances its acquisition of the aircraft through (i) an equity contribution from the entity that is the beneficiary of the Owner Trust (the "Owner Participant") and (ii) borrowings from one or more lenders (the "Lenders").  In more complicated structures, the borrowings may include various forms of public debt financing.

(c) The Owner Trust enters into a Lease with Delta.  The Lease is usually a "net" lease, which requires the lessee to pay all taxes and operating expenses.  Basic rent payments are normally sufficient to amortize the debt payments to the Lenders, and often also provide

6

a cash return – referred to as "equity free cash" – for the Owner
Participant.

(d)  In order to provide security for the borrowed funds, the Owner
Trustee typically grants a security interest in its ownership interests
in the aircraft, and also assigns (for security purposes) its interests
in the Lease, subject to certain exceptions, to an indenture trustee
acting for the lenders (the "Indenture Trustee").

(e) The Indenture Trustee makes debt payments from the lease
rentals and distributes the excess, if any, to the Owner Trust.  The
Indenture Trustee is usually entitled to control the exercise of
remedies upon the occurrence of an event of default.

See Decision [Appellant's Designation No. 39] at 3-4.

Leveraged lease transactions provide significant tax benefits to Owner
Participants.  The Owner Trusts are "grantor trusts" whose existence is ignored for tax purposes,
so that all income and deductions attributable to the Owner Trusts are attributable to the Owner
Participants.  Rental payments are treated as income, but interest payments on the outstanding
debt are deductible, as are transaction expenses (over time).   More importantly, Owner
Participants are entitled to take accelerated depreciation deductions with respect to the aircraft.
The excess of these deductions over the rental income may be used to offset other income that
Owner Participants have, or other income in the consolidated tax group of which Owner
Participants are members.  See Decision at 3-4.

Leases in leveraged lease transactions typically provide for the payment of SLV in the event of a foreclosure or other event.  SLV is usually determined by reference to a schedule attached to the Lease that lists either dollar amounts to be paid or SLV percentages which are multiplied by a fixed number (*e.g.,* the lessor's cost) to generate the dollar amount of SLV.  SLV it is typically calculated to: (i) permit the payoff of the remaining debt; and (ii) allow the Owner Participant to earn an agreed-upon return through the date of termination.  The calculation of SLV includes, *inter alia*, compensation for the adverse tax consequences to the Owner Participant from a foreclosure or other event of default.  Id. at 4.

Lessees in leveraged lease transactions also generally enter into TIAs with Owner Participants to address the potential tax consequences of various events.  Some TIAs provide either (a) indemnification to the Owner Participant if the lessee's acts or omissions result in the "recapture" of prior depreciation deductions or (b) indemnification for unexpected inclusions in the Owner Participant's taxable income as a result of certain listed causes.  Other TIAs provide indemnification to the Owner Participant for both (a) and (b) above.  Id.

Some events that give rise to a tax loss under the TIAs also are events of default under the Leases that give rise to SLV Claims.  Because SLV Claims and TIA Claims in these instances address the same tax consequences to an Owner Participant, the existence of both claims would potentially subject the Lessee (*e.g.,* Delta) to double liability.  The parties' agreements therefore usually contain provisions which recognize and address the potential overlap between the SLV Claims and the TIA Claims.  Id.

## C.    *The Northwestern Transactions*

In 1992, Delta entered into a leveraged lease transaction for one Boeing 767-332ER aircraft (Tail No. N182DN).  Northwestern was the Owner Participant, Wilmington Trust Company ("WTC") was the Owner Trustee and NationsBank of Georgia, National Association

("NationsBank") was the Indenture Trustee.  The Lender was initially Bank of Tokyo Trust Company.  BNY later replaced NationsBank as the Indenture Trustee.

In 1992, Delta also entered into leveraged lease transactions for two McDonnell Douglas MD-11 aircraft (Tail Nos. N803DE and N804DE).  In each of those transactions, Northwestern was the Owner Participant, WTC was the Owner Trustee and NationsBank was the Indenture Trustee.  The Lender for Tail No. 803DE was The Sumitomo Bank, Limited, Atlanta Agency.  The Lenders for Tail No. 804DE were Trust Company Bank and Wachovia Bank of Georgia, N.A.  BNY later replaced NationsBank as the Indenture Trustee.

In the relevant respects, the governing documents for these transactions contain substantially the same provisions.  The transactions involved the following agreements:

(a)  Delta, Northwestern, the Lenders, WTC (as Owner Trustee) and NationsBank (as Indenture Trustee) entered into a Participation Agreement;

(b)  WTC and Delta entered into a Lease;

(c)  WTC and the Indenture Trustee entered into a Trust Indenture and Security Agreement (a "Trust Indenture" and, together with the Lease, the TIA and the Participation Agreement, the "Operative Documents"), granting a security interest in WTC's ownership interests in the aircraft and assigning for security purposes WTC's interest in the Leases to the Indenture Trustee;

(d) The Indenture Trustee made debt payments to the Lenders from the rent payments it received, and distributed any excess to WTC; and

(e) Delta entered into a TIA with Northwestern.

Northwestern has acknowledged that the calculations of SLV under the Leases includes compensation for tax losses that might be incurred by Northwestern itself in connection with a default under the Leases. [Appellant's Designation No. 12; Northwestern Response at 16-17]. See also Decision at 5 ("the parties agree (or at least they have not contested) that the SLV calculations in the Leases do in fact include a tax consequence component resulting in a sum payable under the Leases as part of SLV which is intended to be, and is, equivalent to Delta's obligation under the TIAs"). In this respect, Northwestern acknowledged that the SLV Claims and TIA Claims filed in Delta's bankruptcy case seek compensation for the same tax loss incurred by a single party (*e.g.,* Northwestern).

Each of Northwestern's TIAs address the possibility that the same event could give rise to both TIA Claims and SLV Claims. Section 6(c) (with Section 6 being titled "Exclusions") of each of the TIAs provides, in pertinent part, that:

> The Owner Participant shall not be entitled to any payment . . . in respect of any Loss . . . arising as a result of one or more of the following events:
>
> . . .
>
> (c) Any event whereby the Lessee pays Stipulated Loss Value or Termination Value **or an amount determined by reference thereto**, except to the extent that the calculation of Stipulated Loss Value or Termination Value does not accurately reflect the timing of any such event for federal income tax purposes.

See TIA at 16 (emphasis added).

10

D.    *TIA/SLV Objection 2 And The Decision*

Delta is a party to a large number of leveraged lease transactions.  In the fall of 2006 Delta and the Official Committee proposed various procedures that would permit their objections to TIA Claims and SLV Claims to be litigated, including objections that TIA Claims and SLV Claims were duplicative of each other (*i.e.,* sought compensation for the same alleged tax losses) and that allowance of both claims would impermissibly result in multiple allowances for a single alleged loss.  During a conference on January 31, 2007, the Bankruptcy Court suggested that it would prefer that the Debtors identify different "test cases" which would provide representative samples of the ways in which various of the Debtors' leveraged lease agreements were worded.  Thereafter, the Debtors and the Official Committee filed a series of "test case" objections (the "Test Case Objections"), which generally related to their contention that an inherent "overlap" exists between TIA Claims and SLV Claims.

On February 20, 2007, the Debtors and the Official Committee filed "TIA/SLV Objection 2: Objection by Delta Air Lines, Inc. and the Official Committee of Unsecured Creditors to Certain Claims Filed by Northwestern Mutual Life Insurance Company and the Bank of New York for Tax Indemnities and Stipulated Loss Values".  [Appellant's Designation No. 2].  This objection has been referred to by the parties and by the Bankruptcy Court as "Test Case 2" or as "TIA/SLV Objection 2".

TIA/SLV Objection 2 argued that the TIA Claims (Claim Nos. 4064, 4065 and 4078, collectively, the "Northwestern TIA Claims") [Appellant's Designation No. 30, Fenning Decl., Ex. Nos. 1-3] for Tail Nos. N804DE, N182DN and N803DE (collectively, the "Northwestern Tails") filed by Northwestern in its capacity as owner participant should be expunged for two reasons.  First, Delta and the Committee argued that the Northwestern TIA Claims and the SLV Claims (Claim Nos. 5326, 5335 and 5327, collectively the "BNY SLV

11

Claims") [Appellant's Designation No. 30, Fenning Decl., Ex. Nos. 4-6] filed by BNY, in its capacity as indenture trustee, sought compensation for the same tax losses incurred by Northwestern; that a single loss can give rise only to a single claim in bankruptcy; and that overlapping claims therefore could not be allowed.  See TIA/SLV Objection 2 at 2, 9-14.[2] Second, Delta and the Committee argued that Northwestern's TIAs made clear that Northwestern would not be entitled to any claim if Delta paid SLV or "an amount determined by reference thereto."  Id. at 2, 14-15.  Delta and the Committee asserted that in the alternative, should the Bankruptcy Court decide that Section 6(c) of the TIAs did not warrant the expunging of the Northwestern TIA Claims, that the following language found in Section 6(d) of the Participation Agreements (entitled "Adjustment of Stipulated Loss Value and Termination Value") for the Northwestern Tails mandated that the BNY SLV Claims be adjusted to account for any obligations allowed on the Northwestern TIA Claims:

> If any amount is paid by the Lessee to the Owner Participant pursuant to the Indemnity Agreement, the amounts of Stipulated Loss Value and Termination Value set forth in Exhibit C to the Lease and Schedule 1 to the Indemnity Agreement shall be **recomputed** in the manner set forth in Section 3(e) of the Lease.

Participation Agreement at 43 (emphasis added).

The Bankruptcy Court heard oral argument from the parties concerning TIA/SLV Objection 2 on March 30, 2007.  On May 16, 2007, the Bankruptcy Court issued the Decision [Appellant's Designation No. 39].  The  Bankruptcy Court first overruled the general argument by the Debtors and the Official Committee that a single loss could only give rise to a single

---

[2]    Northwestern has deliberately mischaracterized this argument in its Appellant's Brief, contending that Delta and the Official Committee objected "merely" because the Northwestern TIA Claims and the BNY SLV Claims arose from the same leveraged lease transaction.  Appellant's Brief at 3.  In fact, as explained above, Delta and the Official Committee objected because those claims each sought recovery for one tax loss incurred by one party (Northwestern), and therefore were duplicative of each other.

claim. The Bankruptcy Court noted that the BNY SLV Claims had been assigned to the Indenture Trustees, and held that the general principle of law precluding double recovery for a single injury "has never been applied by any court to void separate *contract* obligations owed to different parties under different contracts." <u>See</u> Decision at 7. The Bankruptcy Court also reasoned as follows:

> We are not dealing with an injury giving rise to a single claim based on multiple theories – the "injury" (tax consequence) by itself does not give any party any right against any other party on any theory. We are concerned here with contract claims by different parties based on different contracts in which the lessee agreed to pay the owner participant under the TIA, and separately agreed to pay the indenture trustee as assignee under the Lease.

*Id*. at 7. The Bankruptcy Court held that "[i]f Delta has contracted to pay duplicative claims, it must pay both – it cannot repudiate its duty to party A under contract A by asserting that it contracted to pay the same amount to party B under contract B." <u>Id.</u> at 8.

The Bankruptcy Court then held, however, that in these cases the parties' contracts (*e.g.,* the Operative Documents) themselves recognized the duplication between TIA Claims and SLV Claims and required that two of Northwestern's TIA Claims (Claim Nos. 4064 and 4078) should be expunged. [Appellant's Designation No. 39, Decision at 6-8, 12-15]. The Bankruptcy Court first rejected Northwestern's contention that the TIAs required that SLV must be paid "in full":

> In asserting that Section 6(c) is triggered only if Delta pays the *full amount* of SLV in *U.S. Dollars*, the owner participant ignores an important clause contained in Section 6(c) and imports into that provision conditions which are not found there. The argument that the lessee must pay the full amount of SLV ignores the clause "or an amount determined by reference thereto." The disjunctive "or an amount" makes clear that the amount paid need not be the full amount of SLV, provided that it is "determined by reference" to SLV.

13

Id. at 14.  The Bankruptcy Court then rejected Northwestern's contention that Section 6(c) would only apply if payment were made in US dollars:

> Moreover, there can be no doubt that the parties contemplated the possibility of bankruptcy on the part of the lessee, since the constituent contracting documents refer in various ways to "bankruptcy [or] other proceedings for the relief of debtors."  The word "pays" and the phrase "or an amount determined by reference thereto" must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy, which the parties expressly contemplated in the TIA, as well as in the other agreements.  There is rarely likely to be full payment of claims in bankruptcy, and in the ordinary course of any Chapter 11 case payment of claims under a plan may be in cash or equity or debt securities of the debtor or a combination of cash and securities.

Id.  Judge Hardin also observed that:

> [t]he fact that Section 3(d) of the Lease expressly requires payment in U.S. dollars certainly demonstrates that the parties knew how to expressly provide for payment in U.S. dollars when that is what they intended.  But it does not support the argument that this provision should be imported to Section 6(c) of the TIA, which does not so provide.  Section 6(c) could have required payment in cash, but it does not.

Id.  Consequently, the Bankruptcy Court determined that when Delta makes a distribution on the BNY SLV Claims (in stock in the Reorganized Debtors pursuant to its Plan) with respect to Tail Nos. N803DE and N804DE, those claims will have been paid "in 'an amount determined by reference' to SLV within the meaning of Section 6(c) and in an amount and manner contemplated by the parties in the context of a bankruptcy."  Id. at 15.

With respect to Claim No. 4065, pertaining to Tail No. N182DN, however, the Bankruptcy Court overruled TIA/SLV Objection 2.  The Bankruptcy Court reviewed the Bingham Term Sheet[3] – a term sheet which describes, among other things, the deficiency claim

---

[3]    The Bingham Term Sheet was approved pursuant to the Bankruptcy Court's February 15, 2006 Order Approving a Modified Term Sheet and an Extension of Section 1110 Deadlines, and Authorizing Agreements to
*(cont.)*

to be allowed in favor of the Indenture Trustee – and held that the Bingham Term Sheet (and Claim No. 5335, BNY's deficiency claim[4]) did not include a reference to SLV.  Id.

### E.    *Motions For Reconsideration And July 18 Order*

After a telephonic conference held by the Bankruptcy Court on May 21, 2007,[5] Delta and the Committee, and Northwestern, each filed motions for reconsideration (the "Motions for Reconsideration") with respect to the Decision.  Delta and the Committee asked for reconsideration of the Decision insofar as it related to Tail No. N182DN, pointing out that the Bingham Term Sheet contained an explicit reference to SLV and suggesting that the Court had inadvertently overlooked that reference.  See "Motion by Delta Air Lines, Inc. and the Post-Effective Date Committee for Reconsideration of the Court's May 16, 2007 Decision Regarding TIA/SLV Objection 2" [Appellant's Designation No. 43].

Northwestern sought reconsideration of the Decision as to the TIA Claims relating to Tail Nos. N803DE and N804DE (*i.e.,* Claim No. 4064 and 4078), rehashing its earlier arguments from its response to TIA/SLV Objection 2 that Section 6(c) exclusion in the TIAs should not apply unless the corresponding BNY SLV Claims for those Tails were paid "in full" and "in cash."  It also argued for the first time that the Bankruptcy Court had allegedly used

---

Restructure Transactions Affecting Eighty-Eight Aircraft and Associated Engines, Equipment and Documents (the "Term Sheet Order") [Appellees' Designation No. 1].

[4]    BNY filed Claim No. 5335 as an omnibus claim pertaining to a number of aircraft subject to the Bingham Term Sheet, including Tail No. N182DN.  It should be noted, however, that Bank of America, N.A. ("BOA"), in its Response to TIA/SLV Objection 2, asserted that it is currently the lender and "beneficial holder" of Claim No. 5335 to the extent such proof of claim relates to Tail No. N182DN.  [Appellant's Designation No. 16].

[5]    Northwestern alleges, in its Appellant's Brief, that the Bankruptcy Court convened the May 21, 2007 telephone conference because the Court allegedly had "second thoughts" about its Decision.  See Appellant's Brief at 9. As the transcript of the May 21 telephone conference plainly shows, however, the Bankruptcy Court convened the call for the simple purpose of discussing the "test case" issues that should be taken up next.  See "Transcript of Telephonic Conference With Respect to TIA/SLV Objections 1 and 2," dated May 21, 2007 [Appellant's Designation No. 41] at 6-8.

"bankruptcy-specific" rules of contract interpretation in violation of the Supreme Court's holding in <u>Travelers</u>, a case that Northwestern had not previously cited.  [Appellant's Designation Nos. 44].

On July 10, 2007, the Bankruptcy Court held a telephonic conference to announce its ruling on the Motions for Reconsideration.  First, the Bankruptcy Court granted the motion filed by Delta and the Committee and reversed its ruling with respect to Tail No. N182DN, with the effect being that all three of the Northwestern TIA Claims would be expunged.  [Appellant's Designation No. 45; July 10, 2007 Transcript at 8].  Specifically, the Bankruptcy Court held that:

> Well, my view on that is that Delta is correct.  I did incorrectly rule that the term sheet was not predicated on a calculation based on SLV. . . . The term sheet says what it says very clearly, and I was simply mistaken, and now I agree with the position of Delta on this issue.

<u>Id</u>.  Northwestern's counsel argued again during this conference that the remedies set forth in the Bingham Term Sheet allegedly were in violation of the Leases because they permitted Delta to re-lease the aircraft, and the Bankruptcy Court noted that "I have, as I said, considered that on the motion to reconsider, and I disagree with it.  I disagree with your position."  <u>Id</u>. at 9.

The Bankruptcy Court next considered Northwestern's argument that the Bankruptcy Court had allegedly applied a special "bankruptcy" rule of contract interpretation that supposedly departed from the <u>Travelers</u> decision.  The Bankruptcy Court observed that its ruling in the Decision did not offend the <u>Travelers</u> decision and explained as follows:

> As to the <u>Travelers</u> case, in essence, the <u>Travelers</u> case says that rights and obligations of parties that are defined by contract are matters for state law, and in construing those rights and obligations under contract, the Court is not at liberty to vary those rights and obligations based upon bankruptcy law or provisions of the Bankruptcy Code.
>
> I have no problem at all with that line of reasoning in the Supreme Court decision in <u>Travelers</u> which, it seems to me, is very, very

16

> basic and putting aside the fact that the <u>Travelers</u> case is now the law of the land, I had always thought that that was the rule at all times. I don't think it is implicated here.

<u>Id</u>. at 11. Contrary to Northwestern's mischaracterization of the Bankruptcy Court's holding below on this point, the Bankruptcy Court made clear that its ruling was based on ordinary principles of contract interpretation:

> I also pointed out, and this may be, I think, where there is some misunderstanding on the part of Northwestern Mutual with regard to what I had in mind, I pointed out that language used in an agreement must be construed in a manner that will reflect the contemplation and understanding and, therefore, intent of the parties. That, I believe, is a fundamental principle of state law in the construction of contracts, and in the interpretation of contractual provisions.

> What I said was, or meant to convey in my opinion, was that when the parties use the phrase in Paragraph 6(c), refer to an event whereby the lessee pays stipulated loss value or an amount determined by reference thereto, the parties must have had, in their contemplation, understanding and, therefore, their intent, the self-evident postulate that stipulated loss value might be required to be paid, or an amount determined by reference to stipulated loss value might be required to be paid in the context of bankruptcy. And in that context, it would be perfectly clear to anybody familiar with bankruptcy and presumably, the lawyers and principals who were responsible for this agreement, that the concept of payment in bankruptcy must contemplate the possibility, indeed, the nearly certain probability, that the payment would not be dollar-for-dollar in cash.

> In so ruling, I was not making a ruling that bankruptcy law supervened to govern the terms of this agreement that we're concerned with, Section 6(c). Rather, my point was that in construing what the parties contemplated and, therefore, intended in writing Section 6(c) as they did, they must have contemplated the possibility, if not the likelihood, of an obligation to pay SLV in the context of bankruptcy, in which context it would almost certainly be impossible to pay in full, in cash.

> My attempt was not, as I said before, to impose the bankruptcy rules of priorities and pro-rata payment and the possibility of a plan contemplating something other than cash, but rather to recognize the fact that this set of agreements clearly contemplated

bankruptcy as a circumstance under which SLV would likely be called upon to be paid.

Id. at 12-13.  Finally, with respect to Northwestern's contention that the TIA itself did not refer to bankruptcy, the Bankruptcy Court cited numerous provisions in the Operative Documents that refer to bankruptcy, showing that "bankruptcy was very much contemplated by the parties to these various structured finance agreements relating to aircraft."  Id. at 14-15.[6]

On July 18, 2007, the Bankruptcy Court entered an Order with respect to TIA/SLV Objection 2 that reflected these rulings (the "July 18 Order").  [Appellant's Designation No. 46].

**F.    _Appeals From The July 18 Order_**

On July 27, 2007, Northwestern filed its Notice of Appeal regarding the July 19 Order.  [Appellant's Designation No. 47].  On  July 27, 2007, Delta and the Committee also timely filed and served their own Notice of Appeal (the "Original Notice of Appeal") regarding the July 19 Order.  [Appellees' Designation No. 6].  On August 1, 2007, Delta and the Committee timely filed and served their Notice of Cross-Appeal, which covered the same matters addressed in the Original Notice of Appeal.  [Appellees' Designation No. 7].

On August 2, 2007, Northwestern filed its Appellant's Designation of Record and Statement of Issues to Be Presented on Appeal.  [Docket No. 2].  On August 6, 2007, Delta and the Committee filed their Designation and Counter-Designation of Contents for Record on Appeal and Cross-Appeal and Statement of Issues to be Presented on Appeal in response to the Appellant's Designation.  [Docket No. 4].  On August 13, 2007, BNY, as Indenture Trustee and

---

[6]    In its Appellant's Brief, Northwestern repeatedly attempts to create the impression that the Bankruptcy Court never considered the actual terms of Northwestern's contracts.  See Appellant's Brief at 5, 10.  This argument is both insulting to the Bankruptcy Court and contrary to the consistent references to the terms of Northwestern's contractual documents in the Decision and the July 10, 2007 Transcript.

Pass Through Trustee filed its Counter-Designation of Contents for Record on Appeal and Cross-Appeal. [Docket No. 5].

Pursuant to a letter to the Clerk of the Bankruptcy Court dated September 7, 2007, Appellees formally withdrew the Original Notice of Appeal in lieu of maintaining only the Notice of Cross-Appeal, which was has been consolidated with the Appeal.

## ARGUMENT AND ANALYSIS

I.     **THE BANKRUPTCY COURT CORRECTLY DISALLOWED THE NORTHWESTERN TIA CLAIMS BASED ON THE LANGUAGE OF THE PARTIES' CONTRACTS**

A.     *Judge Gropper's Recent Northwest Airlines Decision Supports the Bankruptcy Court's Decision and Ruling on the Motions For Reconsideration*

A recent unreported decision by Judge Allan L. Gropper in the Bankruptcy Court involves the interpretation of TIA and SLV contract provisions relevant to those at issue in this Appeal.   See In re Northwest Airlines Corp., Case No. 05-17930 (Bankr. S.D.N.Y. July 27, 2007), attached as Exhibit 1 hereto (the "Northwest Decision").   The Northwest Decision addresses a number of the arguments that have been raised by Northwestern, and so it is useful to review the decision before addressing Northwestern's individual arguments on Appeal.

Northwest Airlines was a party to leveraged leases governing ten aircraft.   The leases were rejected, and the aircraft were sold through a foreclosure process.   Northwest then entered into a stipulation of settlement with regard to the lenders' SLV Claims, and filed a motion seeking approval of the settlement.   Objections were filed by General Foods Credit Corporation ("GFCC"), the owner participant in the underlying leveraged leases for five of the aircraft.   See Northwest Decision at 5.   GFCC argued that it had a right to the allowance of its

TIA claims and that the SLV Claims needed to be reduced, and therefore objected to the settlement of the SLV Claims.  Id. at 8-9.

GFCC's TIAs included an exclusion for tax losses that occurred "as a direct result" of various events.  Section 5(c) provided that no TIA Claim would exist if a loss resulted from:

> [a]ny event as a result of which lessee or any other person has paid stipulated loss value or termination value, or paid the amount required to be the greater of the fair market value of the aircraft and stipulated loss value or termination value in accordance with the provisions of the operative documents, except to the extent that such payment does not reflect the timing of the occurrence for federal income tax purposes; . . .

Id. at 10 (emphasis added).  Section 7 of the TIAs also provided that SLV would be reduced if the lessee were "required" to pay any amount under the TIA:

> [i]f any amount is required to be paid by lessee under Section 4 hereof, owner-participant will compute the stipulated loss value percentages and termination value percentages and special purchase price with respect to the aircraft to reflect such payment in accordance with the manner in which such values were originally computed, or adjusted pursuant to Section 3 of the lease, by owner-participant, and shall certify to lessee either that such values as set forth in the lease do not require change or, as the case may be, the new values necessary to reflect the foregoing recomputation, describing in reasonable detail the basis for computing such new values, and upon such certification, such new values shall be substituted for the values appearing in the lease.

Id. at 8-9.

GFCC argued that the operative documents required that the TIA Claims be allowed and that SLV be reduced accordingly.  Judge Gropper noted, however, that if GFCC's TIA Claims were extinguished by Section 5(c) of the TIAs, then no amount would be "required to be paid" under Section 7 of the TIAs, and accordingly there would be no reason to reduce the

SLV claims.  Id. at 10.  Judge Gropper then rejected various arguments made by GFCC, and held that the documents dictated that the TIA Claims were barred.

GFCC argued that Northwest was not "paying" SLV because, under Northwest's plan of reorganization, SLV "will not have been paid in full, in cash."  Id. at 13.  Judge Gropper rejected this contention, holding that the word "pays" does not require that SLV be paid in cash or in full.  Instead, he held – citing Judge Hardin's Decision – that the references to payments of SLV "'must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy."  Id. at 13-14 (quoting the Decision).  Although the GFCC leases required that all payments be made in cash, Judge Gropper declined to import that requirement into Section 5(c) of the TIAs.  He noted that the operative documents contemplated bankruptcy and other potential defaults and did not depend on payment in all cases in cash and in full.  Id. at 13-15.  Judge Gropper also noted that while some provisions in the operative documents specifically required that payments be made in cash, Section 5(c) of the TIAs did not include such a requirement.  Id. at 14-15.

Judge Gropper further held that the allowance of GFCC's TIA Claims would produce results that were "at odds with the basic structure of the transaction":

> [u]nder the operative documents, stipulated loss value, including the tax component, is part of a package of security assigned to the indenture trustee for the benefit of the debt.  One of the operative documents, the trust indenture and security agreement, contains a waterfall directing payments in respect of the collateral after an event of default.  As should not be surprising, in light of the fact that debt usually comes before equity, the waterfall contains provisions for payments to the debt before payments to the equity. Payments to the owner-trustee for any tax, expense, or other losses come forth in line only after payment to the debt holders to make them whole.

Id.

21

Judge Gropper denied Northwest's request that he disallow GFCC's TIA Claims, because Northwest had not filed an objection to those claims.  Id. at 16.  Accordingly, Judge Gropper held that "while the decision today may be highly persuasive in the future, the Court cannot deal directly with GFCC's proof of claim, and the parties are free to argue as to the effect of this decision on such proof or proofs of claim."  Id. at 16-17.  However, he approved the settlement of the SLV Claims and overruled GFCC's objection thereto.  Id.

**B.**    ***The Bankruptcy Court Correctly Held That the Exclusion in Section 6(c) of the TIAs Does Not Require Payment "In Cash"***

Northwestern, similarly to GFCC in the Northwest case, argues that the exclusionary language of Section 6(c) of the TIAs does not apply to bar the Northwestern TIA Claims unless SLV is paid "in cash."  However, the words "in cash" simply do not appear in Section 6(c).  Northwestern's effort to add additional qualifications and requirements to the clear and unambiguous Section 6(c) is contrary to the plain language of the TIAs, and was properly rejected by the Bankruptcy Court.

As a general matter, the concept of "payment" does not require payment "in cash."  Black's Law Dictionary defines "payment" as the "performance of an obligation by the delivery of money or some other valuable thing accepted in full or partial discharge of the obligation."  BLACK'S LAW DICTIONARY 1165 (8th ed. 2004).  Cash is one way to discharge an obligation, but it is not the only way.

The Operative Documents for the Northwestern Tails which are the subject of this Appeal contemplate many circumstances in which the obligation to pay SLV may be satisfied other than through payments of cash.  Section 15(c) of the Leases, for example, provides that the "Fair Market Value" of the aircraft is to be treated as partial satisfaction of the obligation to pay SLV, regardless of whether a sale occurs.  See Lease at 58-59.  If the "Fair Market Value" of an

aircraft equals or exceeds the amount specified in the SLV table attached to the Leases, then the SLV obligation is fully satisfied, without any payment of cash at all.

Section 15(d) of the Leases similarly treats "sale proceeds" as payments towards the Lessee's SLV obligation. Section 7.03(c) of the Trust Indentures explicitly states that such sale proceeds may include forms of property other than "cash" payments:

> If an Indenture Event of Default shall have occurred and be continuing and the Indenture Trustee shall be entitled to exercise remedies hereunder, and subject to Article VIII hereof, the Indenture Trustee, either with or without taking possession, and either before or after taking possession, and without instituting any legal proceedings whatsoever, may sell, assign, transfer and deliver the whole or, from time to time, to the extent permitted by law, any part of the Indenture Estate, or any part thereof, or interest therein, at any private sale or public auction, with or without demand, advertisement or notice, except as expressly provided for below in this Section 7.03(c), **for cash or credit or for other property**, for immediate or future delivery, and for such price or prices and on such terms as the Indenture Trustee in its sole discretion shall determine . . .

See Trust Indenture at 43 (emphasis added).

Northwestern argues that the Leases require certain payments in cash. However, the Northwestern TIA Claims arise under the **TIAs**, not the Leases, and Northwestern has not cited to a single provision in the TIAs themselves that requires a cash payment of SLV. As the Bankruptcy Court held in its Decision, Section 6(c) of the TIAs "could have required payment [of SLV] in cash, but it does not." See Decision at 14.

Moreover, as Judge Gropper held in Northwest, and as Judge Hardin has now held twice in this case, the fact that the parties referred to "cash" payments in some contracts merely functions to underscore the parties' ability to include such language in the Operative Documents when it was appropriate. The parties did not include that language in Section 6(c) of the TIAs, and New York state contract law is clear that this Court should not "interpret an

agreement as impliedly stating something which the parties have neglected to specifically include." 425 Fifth Ave. Realty Assocs. v. Yeshiva Univ., 228 A.D.2d 178 (1st Dep't 1996) (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 72 (N.Y. 1978)). See also Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 157 (2d Dep't 1983) (holding that when a provision of a contract is clear on its face it should be respected); 805 Third Ave. Co. v. M.W. Realty Assocs., 58 N.Y.2d 447, 451 (1983) (same).

Northwestern contends that interrelated contracts involved in a single transaction should be interpreted as a whole, and concludes that the "cash" payment provisions of the Leases should therefore be imported into Section 6(c) of the TIAs. See Appellant's Brief at 19-21. As noted above, however, the Operative Documents specify numerous other circumstances in which SLV obligations are satisfied without the payment of cash. In addition, as a whole, the Operative Documents explicitly recognized the possibility of bankruptcy, and therefore (as the Bankruptcy Court held) the inevitable possibility that payments would not be made in cash.

Highly sophisticated commercial entities such as the parties to the Operative Documents (as well as their equally sophisticated counsel) understand that the language of their contracts can lead to different results in a "bankruptcy context," and this is especially true when those contracts specifically contemplate a bankruptcy filing by one of the parties as an "event of default." The words of the Operative Documents make clear that the parties were aware of the possibility of bankruptcy. For example, Section 6(a)(iv) (Lessee's Representations, Warranties and Indemnities) of the Participation Agreement states that:

> [t]he Operative Documents to which Lessee is a party, when entered into, will each constitute legal, valid and binding obligations of the Lessee enforceable in accordance with the terms hereof and thereof, **except as such enforceability may be limited by general equitable principles and by applicable bankruptcy,**

24

> **insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally**.

Participation Agreement at 24 (emphasis added). Moreover, Section 7(c)(iii) (Representations, Warranties and Covenants) of the Participation Agreements states that:

> each of such documents constitutes, or on the Refunding Date will constitute, a legal, valid and binding obligation of the Owner Participant, enforceable against the Owner Participant in accordance with its terms, **except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, receivership, fraudulent conveyance or similar laws or equitable principles affecting creditors' rights and remedies generally from time to time in effect, regardless of whether such enforceability is considered in a proceeding at law or in equity.**

Participation Agreement at 48 (emphasis added). Additionally, the Leases explicitly state that a bankruptcy filing such as Delta's constitutes a "default," and the Operative Documents in general contain a host of other references to bankruptcy.[7]

Furthermore, neither Northwestern, nor any of the Indenture Trustees, objected to Delta's Plan, which plainly stated that claims would be paid in stock of the Reorganized Debtors

---

[7]     The Trust Indentures refer to bankruptcy at pages **10** (defining "Lease Bankruptcy Default"), **28** (referring to same), **39** (describing potential bankruptcy filing of the Trust Estate, Owner Trustee or Owner Participant), **40** (addressing the necessity for the Indenture Trustee to respect the automatic stay under section 1110 of the Bankruptcy Code in connection with its potential foreclosure on the Lien of the Indenture), **46** (concerning potential bankruptcy proceeding of the Trust Estate or Owner Trustee), **48** (referring to remedies and procedures for same after a default under the Trust Indenture in the bankruptcy context) and **63** (referencing need for lack of "Bankruptcy Default" under Lease in order for valid replacement of any airframe to occur). The Participation Agreements refer to bankruptcy at pages **4** (addressing "Bankruptcy Default" definition in Lease), **24** (stating that the enforceability of the Operative Documents is limited by "bankruptcy, insolvency, reorganization. . . or similar laws"), **31** (referring to potential bankruptcy filing of Owner Participant), **41** (describing potential bankruptcy filing of an "indemnitee"), **46** (referencing potential limiting effect of bankruptcy proceeding on Operative Documents), **47** (same), **50** (same), **52** (same), **65** (addressing potential bankruptcy filing of Owner Trustee or Owner Participant), **73** (referencing "Bankruptcy Default" in context of request by Delta to change registration of aircraft) and **76** (same and also referring to "Bankruptcy Default" in context of request of refunding procedures). The Leases refer to bankruptcy at pages **3** (defining "Bankruptcy Default" by Lessee as an "Event of Default"), **19** (referring to potential "Bankruptcy Default" of Lessee), **30-31** (same in context of potential subleasing of aircraft by Lessee), **43** (addressing section 1110 of the Bankruptcy Code in connection with an "event of loss" concerning the aircraft); **47-48** (referencing potential "Bankruptcy Default" of Lessee in context of requisition for use of aircraft by a "Requisitioning Government"), **51-52** (same in context of need for aircraft insurance and distribution of proceeds therefrom) and **56** (listing Lessee's bankruptcy petition as an "Event of Default").

rather than in cash.  In fact, Northwestern acknowledges that the BNY SLV Claims in these cases are not of sufficient value to enable repayment of the outstanding debts, and therefore would not enable Northwestern to receive any recovery, no matter what payment medium is used.  In light of that concession, there is no reason why the form of payment should be of any consequence to Northwestern at all.

Given the plain language of the Operative Documents, the persistent references in those documents to bankruptcy, as well as the numerous instances in which the documents themselves envisioned payments in property other than "cash," the Bankruptcy Court was correct in refusing to permit Northwestern to import a "cash" payment requirement into Section 6(c) of the TIAs.

**C.**      ***The Bankruptcy Court Correctly Held That the Exclusion in Section 6(c) of the TIAs Does Not Require Payment "In Full"***

Northwestern also argues that Section 6(c) of the TIAs does not apply unless SLV is paid "in full."  Again, however, the words "in full" do not appear in Section 6(c).  In fact, the alleged requirement of payment "in full" is contrary to the explicit language of Section 6(c), which applies if the lessee pays "Stipulated Loss Value ***or an amount determined by reference thereto***."

Northwestern's attempt to rewrite the plain language of Section 6(c) of the TIAs and add a requirement of payment "in full" is not only contrary to the plain language of those contracts but also contrary to federal bankruptcy law and policy.  A pre-petition contractual requirement that an obligation be "paid" does not mean, in bankruptcy, that a creditor may demand full payment of the claim in U.S. dollars.  Otherwise,  no debtor would ever be able to confirm a plan of reorganization or obtain a discharge.

The most basic rule of bankruptcy is that all general unsecured creditors share their losses on a *pro rata* basis. Many courts in this circuit, including the Bankruptcy Court, have recognized that remuneration in "tiny bankruptcy dollars" satisfies claims in bankruptcy reorganization cases. See, e.g., In re Ames Dep't Stores, Inc., No. 93 Civ. 4014, 1995 WL 311764 at *2 (S.D.N.Y. May 18, 1995) ("[bankruptcy] law allows for compensation only in bankruptcy dollars"); In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 893 n.25 (Bankr. S.D.N.Y. 1993) ("In the vast majority of bankruptcy cases, the *pro rata* distribution is considerably less than the claim amount."); In re Drexel Burnham Lambert Group, 138 B.R. 687, 709 (Bankr. S.D.N.Y. 1992) (bankrupt estates have a right to pay claims in bankruptcy dollars); see also Jay Lawrence Westbrook, A Functional Analysis of Executory Contracts, 74 Minn. L. Rev. 227, 252-53 (1989) ("[f]rom the equality principle comes the rule of *pro rata* distribution to pre-petition unsecured creditors. The *pro rata* rule requires that unsecured creditors share proportionally in distribution, with the result that almost never are they paid in full. Their claims are calculated in full under state law … but their actual relief, the payment of the claims, can be thought of as being in little tiny Bankruptcy Dollars, which may be worth only ten cents in U.S. dollars. . . .").

Bankruptcy law permits Delta to fully pay and discharge its SLV payment obligations by allowing the BNY SLV Claims and making distributions on them in accordance with the terms of the Plan (e.g., through the payment of stock of the Reorganized Debtors). Allowance of the BNY SLV Claims constitutes payment of full SLV – upon the allowance of those claims, and the discharge of Delta's obligations with respect thereto, Delta's payment obligations concerning the Northwestern Tails are discharged in full. See 11 U.S.C. § 1129; 11

U.S.C. § 524(a) (injunction against pursuing claim after discharge); 11 U.S.C. § 1141(d) (discharge from claims after confirmation of plan).

In fact, as Judge Gropper held in <u>Northwest Airlines</u>, Northwestern's contrary interpretation of the contracts would produce results that "are at odds with the basic structure of the transactions." <u>See</u> Northwest Decision, at 14-15. Northwestern (through the Owner Trust) had the right to recover tax losses through the SLV Claims. However, the SLV Claims were pledged to BNY as Indenture Trustee, acting for the lenders. The lenders, through the BNY SLV Claims, will receive recoveries with respect to Northwestern's asserted tax losses. Those payments will extinguish Delta's obligations with respect to the tax losses. If Northwestern does not receive a portion of those recoveries, that is simply a consequence of Delta's bankruptcy and the fact that the BNY SLV Claims were pledged to the lenders, who have superior rights as a result of that pledge.

**D.** *The Bankruptcy Court's Rulings Are Fully Consistent With the Travelers Decision*

Northwestern argues that in making the foregoing rulings, the Bankruptcy Court somehow acted contrary to the United States Supreme Court decision in <u>Travelers Casualty & Surety Co. of America v. Pacific Gas & Elec. Co.</u>, 127 S.Ct. 1199, 1202 (2007). This argument is not only contrary to the Bankruptcy Court's detailed explanations of the grounds for its rulings below, it is also based on a misinterpretation of the <u>Travelers</u> decision.

In <u>Travelers</u>, PG&E Gas & Electric Co. ("PG&E") filed for chapter 11 bankruptcy protection. Travelers Casualty & Surety Co. of America ("Travelers"), which had previously issued a surety bond to guarantee PG&E's payment of state workers' compensation benefits, filed a claim in the bankruptcy case to protect itself should PG&E default on paying those benefits. Litigation over the negotiated language was ultimately resolved by a court-

28

approved stipulation. Id. at 1202-03. Travelers then filed an amended claim to recover its attorneys fees pursuant to provisions in its contract that entitled it to do so. PG&E objected based on a rule adopted by the Ninth Circuit in its decision in In re Fobian, 951 F.2d 1149 (9th Cir. 1991), which decision held that where litigated issues involve issues peculiar to federal bankruptcy law rather than basic contract enforcement questions, attorney's fees in bankruptcy proceeding are not generally awarded. Id. at 1203. The bankruptcy court rejected Travelers' claim on that basis, and the District Court and the Ninth Circuit affirmed. Id.

The Supreme Court reversed. The Supreme Court first agreed that state law contract rights are "subject to any qualifying or contrary provisions of the Bankruptcy Code." See Travelers, 127 S. Ct. at 1201, 1204-05 (quoting Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) (citing Butner v. United States, 440 U.S. 48 at 55, 59 (1979)). The Supreme Court noted, however, that the so-called "Fobian rule" had no textual support in the Bankruptcy Code itself. In the absence of a provision in the Bankruptcy Code that permitted the disallowance of contract-based attorneys' fees claims, the Supreme Court held that disallowance could only occur if Travelers' claims were otherwise barred under applicable state law. That was not the case, so the Supreme Court held that the claims should have been allowed. Id. at 1204-07; see also 11 U.S.C. § 502(b).

Northwestern's primary argument on appeal is that the Bankruptcy Court allegedly imposed its own special "bankruptcy context rule of contract interpretation," in violation of Travelers, in interpreting the plain language of the Northwestern TIAs. That argument is without merit, for two reasons. First, the Bankruptcy Court did not apply a special "bankruptcy" policy in interpreting the parties' contract. As the Bankruptcy Court made abundantly clear in its ruling on Northwestern's Motion for Reconsideration, the Bankruptcy

Court's interpretation of the "payment" language in the Operative Documents reflected the fact that the parties themselves had explicitly contemplated bankruptcy, including in the very "default" provisions that gave rise to the BNY SLV Claims. The Bankruptcy Court therefore rejected Northwestern's argument that Section 6(c) only applies if payment is made to satisfy the BNY SLV Claims "in cash" and "in full," using ordinary rules of contract interpretation.

Second, the circumstances of this case are unlike those that the Supreme Court addressed in Travelers. In Travelers, the Bankruptcy Court attempted to override an enforceable right to collect attorneys' fees, based only on vague notions of bankruptcy policy and without any support in the Bankruptcy Code itself. By contrast, federal bankruptcy law permits a debtor to satisfy obligations in the manner set forth in a confirmed plan of reorganization, including through the payment of stock, and that is true regardless of whether "cash" payments are specified in a contract. See 11 U.S.C. § 1129; 11 U.S.C. § 524(a) (injunction against pursuing claim after discharge); 11 U.S.C. § 1141(d) (discharge from claims after confirmation of plan).

The Supreme Court reaffirmed, in Travelers, that a creditor's pre-petition contractual rights against a debtor in bankruptcy are subject to qualifying Bankruptcy Code provisions to the contrary. To the extent that the Bankruptcy Code enforces a "federal interest [that] requires a different result" from what might occur outside bankruptcy, the Bankruptcy Code takes priority. See Raleigh, 530 U.S. at 20 (quoting Butner, 440 U.S. at 55 (1979)). The Bankruptcy Code permits Delta to satisfy and discharge the SLV Claims through distributions of stock of the Reorganized Debtors, and those provisions of the Bankruptcy Code override any provisions to the contrary in the Operative Documents.

**E.**    ***Northwestern's Other Contract Arguments Were Not Presented to the Bankruptcy Court and Cannot be Raised for the First Time on Appeal, and in any Event are Without Merit***

Northwestern argues that the events giving rise to an SLV obligation will also cause Northwestern to "recapture all or any portion of the MACRS Deductions, the Interest Deductions or the Amortization Deductions." TIA at 11-13. However, Northwestern contends that it should still be able to obtain indemnification of other alleged foreclosure-related Losses arising under Section 5(a)(iv). See Appellant's Brief at 11-12. Northwestern made no such argument before the Bankruptcy Court. It is axiomatic that a party cannot challenge a decision, on appeal, based on a ground that the party never raised before the lower court. See, e.g., Adarand Constructors, Inc. v. Moneta, 534 U.S. 103, 109-10 (2001); Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 446-47 (2d Cir. 2006); Allianz Ins. Co. v. Lerner, 416 F.3d 109, 114 (2d Cir. 2005).

Northwestern's reading of the Operative Documents is also incorrect. Section 6 of the TIAs states that "[n]otwithstanding any provisions to the contrary contained in Section 5 hereof, the Owner Participant shall not be entitled to any payment under Section 5 hereof in respect of **any Loss**…arising as a result of **one or more** of the following events." The listed events include "any event whereby" the lessee pays SLV or an amount "determined by reference thereto"). TIA at 16 (emphasis added). The "events" giving rise to the obligations to pay SLV are Delta's defaults under the Leases. Those are the same "events" that constitute events of default that enabled foreclosure by the Lenders. Consequently, Northwestern's argument that its "foreclosure Losses" can somehow survive the Section 6(c) exclusion is utterly without merit.

Northwestern also argues that its TIA Claims should be allowed because, pursuant to Section 10 of the TIAs, Delta's obligations under the TIAs continue "notwithstanding the expiration or other termination of the Operative Documents, until all such obligations have been

met and such liabilities have been paid in full."  Appellant's Brief at 13-14 (quoting TIA at 25).  However, this begs the question of whether Delta owes any obligation under the TIAs in the first place.  The Bankruptcy Court correctly held, under the plain language of Section 6(c), that Delta does not have any such obligation.  Moreover, the parties' use of the "paid in full" language in Section 10 of the TIAs again highlights the absence of such language in Section 6(c).

**F.**       ***Claim No. 5335 was Calculated in Accordance With, and Will Receive a Distribution "Determined by Reference" To, SLV***

Northwestern's final argument on Appeal is that the Bankruptcy Court incorrectly determined that Claim No. 5335, asserted by BNY as a deficiency claim with respect to a number of aircraft, including Tail No. N182DN, in accordance with the Bingham Term Sheet, was calculated in accordance with, and will receive a distribution "determined by reference" to, SLV (thereby triggering Section 6(c) of the TIAs and expunging  Northwestern's TIA Claim for that Tail).  See Appellant's Brief at 23.

On February 15, 2006, the Court entered the Term Sheet Order.  [Appellees' Designation No. 1].  Pursuant to paragraph 8 of the Term Sheet Order, Delta is authorized "to negotiate and to enter into definitive agreements effectuating the terms set forth in the Term Sheet, without the need for further application to this Court."  Term Sheet Order at 7.  More specifically, via  the Restructuring Agreements that it has entered into with various Owner Trustees and Owner Participants, Delta has restructured the financing terms and conditions concerning its aircraft through a series of transactions that include, *inter alia*: (i) either a foreclosure sale or a "consensual transfer" of the rights of the existing Owner Trustee; (ii) the rejection of the Lease by Delta pursuant to Article 10 of the Plan; (iii) the subsequent entry by Delta into a new Lease; and (iv) the entrance by the parties into other new Operative Documents (*e.g.,* a Participation Agreement and a Trust Indenture).

In accordance with the Term Sheet Order, Delta: (i) rejected the Lease for Tail No. N182DN pursuant to a Notice of Intent to Reject Certain Agreements Listed On Schedule 10.2(c) Related to N182DN and N675DL, dated June 26, 2007 [Bankruptcy Court Docket No. 6357]; and (ii) entered into a Restructuring Agreement, dated April 30, 2007, with WTC as Owner Trustee and BOA as Owner Participant concerning the aircraft. The Restructuring Agreement provides for the allowance of an SLV Claim, calculated in the manner initially set forth in the Bingham Term Sheet.

In Section II.C of the Decision, the Bankruptcy Court initially determined that Claim No. 4065 (Northwestern's TIA Claim with respect to Tail No. N182DN) does not fall within the Section 6(c) TIA exclusion and should therefore not be expunged because the Bingham Term Sheet did not refer to SLV. [Appellant's Designation No. 39, Decision at 15]. However, as Delta has consistently argued and as the Bankruptcy Court eventually agreed in its ruling on the Motions for Reconsideration, the Bingham Term Sheet expressly provides that "stipulated loss value" is an element of the deficiency claim of the Indenture Trustee. [Appellant's Designation No. 27, Reply at 11-12; Appellant's Designation No. 35, March 30, 2007 Transcript at 94-95].[8] Pursuant to the section of the Bingham Term Sheet titled "Calculation of Pre-Petition Damage Claims/Unsecured Claims," in the case of an aircraft lease, an Indenture Trustee may assert an unsecured pre-petition claim for deficiency amounts in accordance with the following formula:

> . . . the sum of (i) **stipulated loss value (or termination value, if termination value is used to calculate damages under the lease remedies)**, calculated as of the filing date pursuant to the existing lease as if a payment of stipulated loss value or termination value,

---

[8]    The parties' arguments relating to the Bingham Term Sheet appear at pages 14-17, 30-36, 68-70, 94-98, 104-105, 108 and 110-11 of the March 30, 2007 Transcript.

as the case may be, were to be made on such date; *plus* (ii) any rent payment which fell due prior to the filing date and which was not paid by Debtor (but without duplication if the amount of stipulated loss value or termination value, as the case may be, determined in clause (i) includes any such payment of rent); *plus* (iii) any actual swap breakage incurred or expected to be incurred (to the extent a swap has not yet been broken at the time of calculating a claim) by the lender, to the extent that the applicable Existing Agreements provide for such swap breakage; *plus* (iv) any portion of arrears rent accrued and unpaid from the table date used for determining stipulated loss value or termination value in clause (i) accrued to the filing date (but without duplication if the amount of stipulated loss value or termination value, as the case may be, determined in clause (i) includes any such amount); *minus* the sum of (x) any portion of any advance rent paid but not accrued prior to the filing date (only to the extent provided for in the applicable Existing Agreements); *plus* (y) the aggregate rent or other payments (such as deferral payments or interest thereon) scheduled to be received hereunder after the filing date or under the restructured lease with Debtor; *plus* (z) the expected residual value based upon a half-life base value appraisal from Airclaims), in each case such amounts in (y) and (z) discounted (as appropriate) back to the filing date at a discount rate of 10% per annum.

[Appellees' Designation No. 1, Bingham Term Sheet at 2]. (emphasis added). Indeed, the specific amount asserted by BNY in Claim No. 5335 was determined by: (i) starting with SLV; (ii) adding the amount of unpaid rent and, where applicable, the "swap breakage" payable under other agreements; and (iii) subtracting therefrom an agreed-upon value of the new restructured deal and the present value of the residual value of the aircraft.

The calculations set forth in the Bingham Term Sheet are consistent with the remedy provisions of the Leases, each of which makes clear that the "value" of the aircraft (in the form of fair market value, sales proceeds, etc.) is to be deducted from SLV in calculating an SLV Claim, with SLV specifically being used as a starting point for that calculation. See, e.g., Lease, §§ 15(c) and 15(d). Unquestionably, Claim No. 5335 was "calculated by reference to" SLV for purposes of Section 6(c) of the TIAs.

Northwestern argues that the Bingham Term Sheet "violates the terms of the Operative Documents." Appellant's Brief at 23. This argument is premised on Northwestern's contention that the Operative Documents "prohibit" Delta from retaining possession of the aircraft and entering into a new Lease upon the occurrence of a default. Id. at 23-24. However, there is not a single provision in any of the Operative Documents that prohibits Delta from entering into a new Lease with respect to the relevant aircraft, and Northwestern has not even purported to cite to any. [Appellant's Designation No. 35, March 30, 2007 Transcript at 108, 110-11].

Section 8.01 of the Trust Indenture for Tail No. N182DN states that "the Indenture Trustee shall at all times have the right, to the exclusion of the Owner Trustee and the Owner Participant, to . . . declare the Lease to be in default under Section 15 hereof." Trust Indenture at 53. Section 7.02(a) of the Indenture similarly provides that, upon the default under the Lease, the Indenture Trustee:

> may exercise any or all of the rights and powers and pursuant any and all of the remedies pursuant to this Article VII and . . . any and all of the remedies pursuant to Section 15 of the Lease, and may take possession of all or any part of the properties covered or intended to covered by the Lien and security interest created hereby or pursuant hereto and may exclude the Owner Participant, the Owner Trustee and the Lessee and all persons claiming under any of them wholly or partly therefrom.

Trust Indenture at 40. Pursuant to Section 15(g) of the Leases, after an Event of Default (e.g., Delta's bankruptcy filing), and provided that such default is continuing, the lessor may "exercise any other right or remedy which may be available under applicable law . . ." Lease at 60. The Indenture Trustees, exercising their clear rights, have determined that they will cancel the existing Leases and thereafter enter into new Leases with Delta. Those new Leases are consistent with "applicable law" and they plainly are permissible under the terms of the Lease.

35

While some of Delta's Leases, with other parties, did contain a prohibition against a new Lease with Delta, there is no such prohibition in the Lease or in any of the other Operative Documents governing Tail No. N182DN.

Northwestern also asserts that the remedies listed in Sections 15(a) through 15(e) of the Leases should be interpreted as though they constitute the sole and exclusive remedies of the Lessor/Indenture Trustee, and points out that those provisions do not explicitly mention the possibility of a new lease. Id. However, as Delta and the Committee have consistently pointed out to the Bankruptcy Court, the Leases state explicitly that the remedies listed in Sections 15(a) through 15(e) are not exclusive. Pursuant to Section 15(g) of the Leases, after an Event of Default (e.g., Delta's bankruptcy filing), the lessor may "exercise any other right or remedy which may be available under applicable law . . ." Lease at 60. The concluding paragraph of Section 15 of the Leases also states explicitly that:

> [e]xcept as otherwise expressly provided above, no remedy referred to in this Section 15 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity. The exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any other remedies.

Id.

Finally, Northwestern has reiterated its argument that Claim No. 5335 is not a "SLV Claim" for purposes of applying Section 6(c) because the proof of claim itself allegedly did not refer to SLV. [Appellant's Brief at 23; Appellant's Designation No. 12, Northwestern Response at 4, 22]. However, Claim No. 5335 clearly requests payment of the full "net" amounts determined pursuant to the Bingham Term Sheet. As Northwestern acknowledges, those sums were plainly determined with SLV as the starting point. See Appellant's Brief at 25. Consequently, the distributions that Delta will eventually make on Claim No. 5335 will be ones

36

that are "determined by reference" to SLV (thereby eliminating Northwestern's right to receive a distribution on Claim No. 4065), even if the proof of claim does not mention "SLV" on its face.

## II.    REGARDLESS OF THE CONTRACTUAL TERMS OF THE OPERATIVE DOCUMENTS, THE LAW REQUIRES DISALLOWANCE OF DUPLICATIVE CLAIMS TO THE EXTENT OF THE OVERLAP

Regarding the Appellees' Cross-Appeal, even if the Operative Documents did not require disallowance of the Northwestern TIA Claims in these circumstances, those claims would still have to be disallowed on the ground that they are encompassed within the BNY SLV Claims. The Bankruptcy Court's conclusion that the parties are free to contract for a multiple recovery on a single loss is erroneous.[9] Allowing parties to structure their contracts so as to obtain a distribution in bankruptcy that exceeds the size of their non-bankruptcy claim violates the entire priority scheme of the Bankruptcy Code by contravening, to the detriment of all other creditors, the policy of *pro rata* distribution of estate assets.

As the Bankruptcy Court recognized, it is common, in the law, that a claimant may be entitled to recover for a single injury based on multiple legal theories; yet it is generally recognized that a loss provides a claimant with only one right of payment, no matter now many separate legal theories the claimant may invoke in support of that right of payment. Persons injured by defective products, for example, may be entitled to recover compensation under theories of strict product liability, negligence, and/or breach of warranty. Persons who are deceived in connection with financial investments may be entitled to recover compensation under claims of fraud, negligent misrepresentation, breach of fiduciary duty, breach of contractual representations or warranties, and/or violations of federal or state disclosure statutes.

---

[9]    This is an alternative ground for affirming the July 18 Order with respect to Northwestern and disallowing the Northwestern TIA Claims. Appellees, however, also filed the Cross-Appeal to ensure that they have preserved their rights of appeal with respect to all matters decided adversely to them.

Officers and directors who seek indemnification may be entitled to rely on statutory principles, corporate by-laws or individual employment contracts to provide such indemnification. But in each of those situations, the claimant may only be paid once. <u>Diversified Graphics, Ltd. v. Groves</u>, 868 F.2d 293, 295 (8th Cir. 1989) ("Regardless of whether the harm was the result of negligence or breach of fiduciary duty or a combination of both, there is only a single injury and there may only be a single recovery.").

This rule applies in bankruptcy cases as well. For bankruptcy purposes, a "claim" is a "right to payment." 11 U.S.C. § 101(5). The existence of multiple <u>theories</u> under which recovery may be sought from a debtor does not change the fact that a single loss gives rise to a single right to payment and therefore a single "claim" against the debtor for bankruptcy purposes. In bankruptcy, therefore, "multiple recoveries for an identical injury are generally disallowed." <u>In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey</u>, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993).

In <u>Finley</u>, for example, the debtor had failed to make required pension plan contributions, resulting in an underfunding of its pension plan. <u>Id</u>. at 893. The pension plan trustee, on one hand, filed a claim against the debtor to collect the unpaid plan contributions. <u>Id</u>. at 887. The Pension Benefit Guaranty Corporation ("<u>PBGC</u>"), on the other hand, filed a claim against the debtor for the amount of the debtor's unfunded benefit liabilities that were insured by the government. <u>Id</u>. Each claim was based on a different legal theory and filed by a different party, but each claim related to the same "loss": that is, the economic effect (on the pension plan) of the debtor's failure to make a required payment. The bankruptcy trustee objected to the claims, arguing that both claims sought recovery for an identical injury. <u>Id</u>. at 893.

The pension plan trustee and PBGC argued in <u>Finley</u> that their claims arose from different legal rights and that, even if they overlapped, the claims should only be reduced to the extent that the debtor's estate actually paid the separate claims in "tiny bankruptcy dollars," not to the extent that the claims were allowed in pre-bankruptcy dollars. <u>Id</u>.  The bankruptcy court in <u>Finley</u> rejected this position, finding it to be "entirely at odds with fundamental bankruptcy policy favoring equality of distribution among similarly situated creditors."  <u>Id</u>. at 894.  The court noted that the claims sought compensation for the same loss (the debtor's missed pension contribution), and that the allowance of both claims, or the reduction of the claims only to the extent of actual payment in "tiny bankruptcy dollars," would result in a distribution with respect to that loss that would exceed the ratable distribution to all other unsecured creditors.  <u>Id</u>. at 894. Thus, the court held that such an outcome would be "inconsistent with the letter and spirit of Title 11," and disallowed the claims to the extent that they sought compensation for the same loss.  <u>Id</u>.

Other cases have also reached the same conclusion.  <u>See</u>, <u>e.g.</u>, <u>In re Simetco, Inc.</u>, No. 93-61772, 1996 WL 651001, at *3  (Bankr. N.D. Ohio Feb. 15, 1996) (disallowing claim to the extent it related to the same loss that was covered by another claim in light of the potential windfall to the creditor, and holding that multiple recoveries for the same loss "would violate the principles of ratable distribution and offend the notion of uniform treatment for creditors"); <u>In re Chateaugay Corp.</u>, 115 B.R. 760, 784 (Bankr. S.D.N.Y. 1990), <u>aff'd</u>, 130 B.R. 690 (S.D.N.Y. 1991), <u>vacated</u> <u>by</u> <u>agreement</u> <u>of</u> <u>the</u> <u>parties</u>, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809 (S.D.N.Y. June 16, 1993) (holding that claims for unpaid contributions and claims for "plan insufficiency" were duplicative of each other, and that allowing "two dollars of claims against the same Debtor for one dollar of loss violates the principles of equality of distribution and

uniformity of treatment of creditors that are fundamental to the Code"); In the Matter of Brinke Transp., Inc., No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989) (where claims substantially overlapped, striking claim that was subsumed in other claims). Although the decision in Chateaugay was vacated by agreement, the Simetco court still found the reasoning persuasive with respect to its holding that duplicative claims should be disallowed based on bankruptcy policy. See Simetco, 1996 WL 651001, at *3 n.3.

While the Bankruptcy Court recognized the principle against double recoveries articulated in Finley, it mistakenly believed that that principle was inapplicable here. The Bankruptcy Court's decision rested on three errors of law.

First, the Bankruptcy Court believed that contract claims should be treated differently from other claims, because other claims involve a right to recover for an "injury," Decision at 7, while in the Bankruptcy Court's view, parties are free to "contract[] to pay duplicative claims" if they wish to do so, regardless of the amount of any actual loss. Id. at 8. The Bankruptcy Court's view is incorrect here. Under New York law, even outside of bankruptcy, contract claims must be based on actual losses. A contractual agreement to pay an amount, upon default, that is not based on the other party's actual loss is contrary to public policy and void as a penalty. See, e.g., In re T.R. Acquisition Corp., 309 B.R. 830, 837-38 (S.D.N.Y. 2003) (holding that provision of master lease calling for double rent in the event of a failure to vacate was disproportionate to the actual damages suffered by landlord and therefore an unenforceable penalty).

Here, the Leases provide for a payment of SLV to compensate the Owner Participant for the loss of the economic benefits of the Leases – including the loss of tax benefits – upon the occurrence of certain defaults. The TIAs separately provide for a payment to

compensate the Owner Participant for loss of the same tax benefits.  If, as Northwestern contends, the contracts required Delta to compensate for the same loss twice, this would be nothing but an unenforceable penalty.

Second, the Bankruptcy Court believed that in this case the contract obligations addressed different debts that were owed to "different parties."  The Bankruptcy Court based its view on the fact that, following the assignment of the Leases, the amounts payable thereunder would be received by the Indenture Trustees, who would apply those sums in payment of the debts owed by the Owner Trusts.  Again, the Bankruptcy Court's view is incorrect.

As described above, the Indenture Trustees are not parties to the Leases.  Instead, Delta entered into the underlying Leases with the Owner Trusts, and the SLV damages specified in the Leases are calculated with respect to the potential interests of the Owner Trusts.  The Indenture Trustees, as pledgees, merely stand in the shoes of the Owner Trustees for purposes of collecting sums due under the Leases.

The Owner Trusts, in turn, are "grantor trusts" that exist solely for the benefit of the Owner Participants.  Under the grantor trust rules, the Owner Participants are taxed directly based on the income, deductions and credits to which the Owner Trusts would be entitled, just as though the Owner Trusts did not exist.  See I.R.C. § 671; Treas. Reg. § 1.671-3(a)(1); Rev. Rul. 85-13, 1985-1 C.B. 184; Rev. Rul. 57-390, 1957-2 C.B. 326.  The Owner Trustee has no separate existence for tax purposes; the Owner Trustee and the Owner Participant are the same entity for that purpose.

For purposes of the inclusion of tax losses in SLV, therefore, Northwestern and the Owner Trustee are not separate parties at all.  If they were separate parties, then the inclusion of Northwestern's tax losses in the computation of SLV would simply have been an

unenforceable "penalty" from the outset. Only Northwestern – not any other party – incurs the tax losses that are addressed in SLV.

SLV Claims and TIA Claims provide different legal theories under which a single loss (Northwestern's tax loss) may be recovered by a single party (Northwestern). The SLV Claims were assigned to the Indenture Trustees, but those assignments do not change the underlying character of the claims and do not create two rights of recovery where only one exists.

Third, the Bankruptcy Court did not take account of the fact that the multiple liability – if the contracts are to be read as Northwestern proposes – would arise only if Delta was unable to pay, and therefore would allow contracting parties to manipulate the bankruptcy system by giving themselves a disproportionate recovery at the expense of other creditors. The multiple liability would not arise outside of bankruptcy because, even on Northwestern's view, payment in full of SLV would discharge the TIA obligation. See Appellant's Brief at 4. Contracting for multiple recovery based on inability to pay would offend the scheme of the Bankruptcy Code, in that it would boost the percentage of recovery on Northwestern's tax loss claim – by Northwestern and its effective assignee, BNY, collectively – at the expense of other creditors.

An example helps to illustrate this. Assume, for purposes of illustration, that the required SLV payment to BNY in a given transaction would be $100, of which $75 represented payment of outstanding debt and the remaining $25 represented compensation to Northwestern, as owner participant, for its anticipated increased tax liability. Outside of bankruptcy, if Delta satisfied the $100 SLV obligation to BNY as indenture trustee, then (i) BNY would use $75 to repay lenders, (ii) BNY would pay the remaining $25 to Northwestern as owner participant to

cover its increased tax liability, and (iii) Northwestern's TIA Claim would be extinguished because Northwestern has, in its own words, received "full compensation" for its losses. Id. In that case, Delta's total out-of-bankruptcy payment obligation – the collective "right to payment" possessed by the BNY and Northwestern – would be $100.

Correctly viewed, the collective "claims" asserted by BNY and Northwestern in bankruptcy in this example similarly should be equal to $100, the same as the amount of their collective "right to payment" with respect to Northwestern's tax losses. See 11 U.S.C. § 101(5). The view that the Bankruptcy Court took in this case, however, would lead to a very different result. Assume, again for the sake of illustration, that Delta's plan hypothetically called for the distribution of 60 cents for each dollar of claims. If Northwestern were correct that only "full compensation" could discharge its TIA Claim (Appellant's Brief at 4; but see supra Part I), then the Bankruptcy Court would allow BNY's SLV Claim in the amount of $100, and also allow Northwestern's TIA Claim in the amount of $25, for a total claim of $125. On the assumption that Delta was paying 60 cents on the dollar, Delta would distribute a total of $75 with respect to those two claims (60% of $125). That would mean a distribution of 75% with respect to an out-of-bankruptcy payment obligation of $100, or a recovery of 75%, compared to a recovery by other unsecured creditors of only 60%.

As courts have consistently found, such an inequitable distribution would be entirely "inconsistent with the letter and spirit of Title 11." Finley, 160 B.R. at 894. Given that other creditors who are affected by the inequitable distribution did not consent to this unequal treatment, it is immaterial whether Delta and Northwestern agreed to it by contract. The policy of disallowing duplicative claims in bankruptcy, even when agreed to by contract, is also

reflected in 11 U.S.C. § 502(e), which bars a creditor and a guarantor from asserting duplicative claims against a bankruptcy estate.[10]

To the extent that SLV Claims and TIA Claims (which by their nature are already included in SLV Claims) provide compensation for the same loss incurred by the same party, they simply represent multiple legal theories upon which the same loss may be recovered.  For bankruptcy purposes, a single loss can give rise to only one "right to payment" and only one claim against the debtor, regardless of how many separate contractual theories of recovery may be asserted.  If parties were free to contract around the Bankruptcy Code's policy of *pro rata* treatment of claims of the same class through the granting of duplicative claims, it would result in the substantial dilution of the interests of non-consenting creditors who are only permitted to assert one claim for their loss.  The Bankruptcy Court erred in failing to recognize this effect of its Decision, which provides yet another ground for affirming the Bankruptcy Court's disallowance of the Northwestern TIA Claims.

---

[10]  See S. Rep. No. 95-989 at 65 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5851 (stating that Section 502(e) "prevents competition between a creditor and its guarantor for the limited proceeds in the estate"); H.R. Rep. No. 95-595 at 354 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6310 (same); In re Hexcel Corp., 174 B.R. 807, 811 (Bankr. N.D. Cal. 1994) ("The legislative history surrounding the enactment of 11 U.S.C. § 502(e)(1)(B) reveals that § 502(e)(1)(B) was primarily intended to protect the limited assets of a bankruptcy estate from duplicative claims").

## <u>CONCLUSION</u>

For all of the foregoing reasons, and those stated in the Bankruptcy Court's Decision and its rulings on the Motions for Reconsideration, Delta and the Committee submit that the July 18 Order with Respect to TIA/SLV Objection 2 should be affirmed.

Dated:  New York, New York
        November 13, 2007

STROOCK & STROOCK & LAVAN LLP


s/ Kristopher M. Hansen
Lawrence M. Handelsman (LH-6957)
Kristopher M. Hansen (KH-6957)
Jayme T. Goldstein (JG -9054)
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile:  (212) 806-6006


Counsel to Reorganized Debtors

AKIN GUMP STRAUSS HAUER & FELD LLP


s/ David H. Botter
Daniel H. Golden (DG 5624)
David H. Botter (DB 2300)
Mitchell P. Hurley (MH 0740)
590 Madison Avenue
New York, New York 10022
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Counsel for the Official Committee of Unsecured Creditors of Delta Air Lines, Inc., *et al.*