**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, NY 10036-4039
(212) 858-1740
Leo T. Crowley (LC-1311)
Eric Fishman (EF-9664)
Margot Erlich (ME-2117)

Attorneys for The Bank of New York, as
Indenture Trustee and Pass Through Trustee

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, | ) ) ) ) |
| Appellant, | ) ) ) |
| vs. | ) ) ) |
| DELTA AIR LINES, INC., THE POST-EFFECTIVE DATE COMMITTEE OF DELTA AIR LINES, INC. and THE BANK OF NEW YORK, AS INDENTURE TRUSTEE AND PASS THROUGH TRUSTEE, | ) ) ) ) ) ) ) |
| Appellees. | ) ) ) ) ) |

**Case No. 07-CV-7745 (RB)**
(ECF Case)

**BRIEF OF APPELLEE THE BANK OF NEW YORK, AS
INDENTURE TRUSTEE AND PASS THROUGH TRUSTEE, IN
<u>RESPONSE TO APPELLANT'S OPENING BRIEF ON APPEAL</u>**

500182320v11

## TABLE OF CONTENTS

Page

BASIS OF APPELLATE JURISIDCTION ................................................................................... 1
ISSUE ON APPEAL...................................................................................................................... 1
STATEMENT OF THE CASE....................................................................................................... 1
    A.  Nature of the Case ............................................................................................................ 1
    B.  The Proceedings Below ................................................................................................... 1
    C.  Disposition Below............................................................................................................ 3
    D.  Statement of Facts ........................................................................................................... 4
        1.  Background on Leveraged Lease Transactions ................................................... 4
        2.  The Leveraged Lease Transactions at Issue......................................................... 5
        3.  Post-Petition Transactions Concerning N803 and N804 ..................................... 6
        4.  Post-Petition Transactions Concerning N182 ..................................................... 6
ARGUMENT.................................................................................................................................. 7
    A.  Neither the Indenture nor the Structure of Leveraged Lease Transactions Caps
         Delta's Payment Obligation at the Full SLV Amount .................................................... 8
    B.  The Indenture Trustee Did Not Violate the Operative Documents in Entering
         into the Term Sheet Agreement .................................................................................... 12
CONCLUSION............................................................................................................................. 17

## TABLE OF AUTHORITIES

### CASES

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ................................................................................................................9

*Harris v. Key Bank Nat'l Ass'n*,
    193 F. Supp. 2d 707 (W.D.N.Y. 2002) ....................................................................................9

*In re Delta Air Lines, Inc.*,
    370 B.R. 537 (Bankr. S.D.N.Y. 2007) ...................................................................................16

*In re Delta Air Lines, Inc.*,
    374 B.R. 516 (S.D.N.Y. 2007) ...............................................................................................16

### STATUTES

28 U.S.C. § 158(a)(1) (2007) ............................................................................................................1

N.Y.U.C.C. § 9-610(b) (McKinney 2007) .....................................................................................10

N.Y.U.C.C. § 9-622(a)(2) (McKinney 2007) ..................................................................................9

Appellee The Bank of New York, as Indenture Trustee and Pass Through Trustee ("BNY"), by its counsel, Pillsbury Winthrop Shaw Pittman LLP, hereby submits its brief in response to the brief of Appellant The Northwestern Mutual Life Insurance Company ("Northwestern Mutual") dated October 8, 2007.

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1) (2007), as the appeal is from a final order of the Bankruptcy Court.

## ISSUE ON APPEAL

Whether the Bankruptcy Court correctly construed certain tax indemnity agreements in denying Northwestern Mutual's claims for tax indemnification?

## STATEMENT OF THE CASE

A.   Nature of the Case

This appeal concerns the construction of certain Tax Indemnity Agreements between Delta Air Lines, Inc. ("Delta") and Northwestern Mutual, executed in 1992 and amended and restated in 1993 (each a "TIA" and collectively the "TIAs") in connection with three aircraft leveraged lease transactions.

B.   The Proceedings Below

In August 2006, BNY filed three proofs of claim in the Delta bankruptcy seeking approximately $167 million arising out of the rejection by Delta of three aircraft leases. NW D. 30 at Exs. 4, 5 and 6.[1]  BNY is no longer the real party in interest with respect to one of these proofs of claim (that concerning Tail No. N182DN), although BNY addresses certain issues raised with respect to that aircraft to the extent such issues impact

---

[1]   "NW D." refers to the record designations by Northwestern Mutual.  "BNY D." refers to the record designations by BNY.  "Delta D." refers to the record designations by Delta.

BNY in this and related transactions and disputes. The amounts claimed were based, in part, upon stipulated loss value ("SLV") tables set forth in each of the applicable leases.

In or about the same time, Northwestern Mutual filed three proofs of claim for indemnification of tax losses under TIAs relating to the same aircraft. *Id.* at Exs. 1, 2 and 3. The TIA claims totaled approximately $85 million and arose out of, *inter alia*, BNY's foreclosure on Northwestern Mutual's equity interests in such aircraft.

On February 20, 2007, Delta and the Official Creditors Committee filed their TIA/SLV Objection 2: Objection by Delta Airlines, Inc. and the Official Committee of Unsecured Creditors to Certain Claims Filed by Northwestern Mutual Life Insurance Company and The Bank of New York for Tax Indemnities and Stipulated Loss Values (the "TIA/SLV Objection"). NW D. 2. The TIA/SLV Objection sought to disallow Northwestern Mutual's TIA claims on the basis that its tax losses fell within certain of the TIAs' exclusion provisions. *Id.* ¶¶27-30 at 14-15. The exclusion at issue provides in relevant part that the TIA does not apply to any tax loss arising as a result of "[a]ny event whereby the Lessee pays Stipulated Loss Value or Termination Value or an amount determined by reference thereto." NW D. 13 at Ex. 1, TIA §6(c) at 17.[2] Alternatively, Delta sought to disallow the SLV claims to the extent any of the TIA claims were allowed, arguing that part of the SLV claims included amounts based upon Northwestern Mutual's tax losses and that payment of both the TIA and SLV claims in full would result in Delta paying for the same tax losses twice. NW D. 2, TIA/SLV Objection ¶¶25-26 at

---

[2] Because the contracts in the three leveraged lease transactions at issue are substantively the same, the parties, for simplicity, agreed to cite only to the transaction documents for N803. Additionally, although the original transaction documents have been amended and restated, the parties have cited to the original documents, which contain, for purposes here, substantively identical provisions to those set forth in the amended and restated documents. These transaction documents are annexed to the Declaration of Karen Stevens at NW D. 13.

13-14 and ¶31 at 15.

C.     Disposition Below.

On May 16, 2007, the Bankruptcy Court issued its decision, denying Delta's TIA/SLV Objection to the extent it sought disallowance of the TIA or SLV claims based on the asserted overlap in the claimed amounts.  The Bankruptcy Court explained that there is no conceptual reason why Delta might not have agreed to pay both the TIA and SLV amounts in full, even if the SLV included a tax loss component.  "If Delta has contracted to pay duplicative claims, then it must pay both – it cannot repudiate its duty to party A under contract A by asserting that it contracted to pay the same amount to party B under contract B."  NW D. 39, Decision at 8.

Turning to the specific contractual language governing the TIA and SLV claims, the Bankruptcy Court overruled Delta's objections to the SLV claims.  *Id.* at 14-15.  The Bankruptcy Court granted the objection with respect to two of the TIA claims on the basis that the claimed tax losses arose from an excluded event, specifically, an event triggering an SLV payment or an amount determined by reference thereto.  *Id.* at 12, 15.  Initially, however, the Bankruptcy Court allowed one of the TIA claims (the "N182 TIA Claim"), reasoning that the N182 tax loss was not the result of an SLV-triggering event.  *Id.* at 15.

Thereafter, the Bankruptcy Court received motions for reconsideration.  These motions were not, as Northwestern Mutual asserts, prompted by the Bankruptcy Court's "second thoughts" or its "acknowledge[ment] that it had not read Northwestern Mutual's contracts."  NW. Br. at 9-10.  To the contrary, the Bankruptcy Court stated to counsel for Northwestern Mutual that "I think I've paid rather close attention to your brief and to the

provisions that you quoted." NW D. 41, May 21, 2007 Tr. at 14:24 – 15:1. Nonetheless, the Bankruptcy Court invited reconsideration motions, stating it was the Court's practice to always "welcome motions to reconsider" and that "I always reconsider when I get a motion to reconsider." *Id.* at 12:18-19. In response to the ensuing reconsideration motions, the Bankruptcy Court affirmed each of its prior holdings, except with respect to the N182 TIA Claim, which it then disallowed on the basis that such claim was, in fact, based upon an event giving rise to the payment of SLV or an amount determined by reference thereto. NW D. 45, July 10, 2007 Tr. at 8:8-16; 9:17-22.

D.  Statement of Facts

    1.  Background on Leveraged Lease Transactions

As explained by the Bankruptcy Court below, in aircraft leveraged lease transactions, an owner trust acquires ownership of an aircraft through (i) an equity contribution by a beneficiary of the owner trust (the "owner participant") and (ii) loans provided by one or more lenders (the "lenders" or "noteholders"). The owner trust, in turn, enters into an aircraft lease (the "Lease") with the aircraft operator, here, Delta. Rent payments under the Lease are usually sufficient to amortize the debt payments and provide a return to the owner participant. NW D. 39, Decision at 3.

To secure the loans, the owner trustee typically grants a security interest in the aircraft and related lease to an indenture trustee (here, BNY), acting on behalf of the lenders. Such interests are conveyed pursuant to a trust indenture and security agreement (the "Indenture") between the owner trustee and the indenture trustee. Upon the occurrence of a default under the Lease, the indenture trustee, as secured party, is entitled to control the exercise of remedies under the Lease. One such remedy permits the indenture trustee, as the pledgee of the Lease, to seek payment of "stipulated loss value"

(SLV), which is a liquidated damages payment set forth in the Lease, often based on a sliding percentage of the aircraft's initial cost. *Id.* at 3-4.

Leveraged lease transactions can provide significant tax benefits to owner participants, both through the payment of deductible interest expenses and, more importantly, accelerated depreciation of the aircraft. To protect against the loss of certain of these tax benefits, owner participants often obtain tax indemnifications from lessees pursuant to TIAs. *Id.* at 4.

2.      The Leveraged Lease Transactions at Issue

In 1992, Delta entered into leveraged lease transactions for two McDonnell Douglas MD-11 aircraft with tail numbers N803DE ("N803") and N804DE ("N804"). In these transactions, Northwestern Mutual was the owner participant, Wilmington Trust Company ("WTC") was the owner trustee, and NationsBank of Georgia, National Association ("NationsBank") (subsequently replaced by BNY) was the indenture trustee. The initial lenders, who have since been replaced, were Sumitomo Bank, Limited, Atlanta Agency in one transaction, and Trust Company Bank and Wachovia Bank of Georgia, N.A. in the other transaction. NW D. 2, TIA/SLV Objection ¶¶12, 14 at 7-8; *see also* NW D. 13 at Ex. 4, Participation Agreement.

In 1992, Delta also entered into a leveraged lease transaction for a Boeing 767-332ER aircraft with tail number N182DN ("N182"). Northwestern Mutual was the owner participant, WTC was the owner trustee, Bank of Tokyo Trust Company was the lender, and NationsBank was the indenture trustee. NW D. 2, TIA/SLV Objection ¶¶11, 14 at 7-8. Subsequently, the secured debt was repaid, the indenture was terminated and there is no longer is an indenture trustee for this transaction. The present holder of the

SLV claim for N182 is Bank of America.

    3.    <u>Post-Petition Transactions Concerning N803 and N804</u>

Delta filed a motion to reject the Leases for the two MD-11 aircraft shortly after the petition date, and the Bankruptcy Court granted such motion on November 29, 2005. BNY D. 1, Final Order Authorizing Debtors to Reject Certain Aircraft. Thereafter, BNY, as indenture trustee, strictly foreclosed on the collateral pledged to it under the Indenture with the consent of WTC, as the owner trustee, Northwestern Mutual and Delta. NW D. 25, BNY Response to SLV/TIA Objection ¶9 at 4. As a result of this foreclosure, the owner trustee was relieved of any further obligations to the indenture trustee with respect to the non-recourse debt. BNY, as indenture trustee, became the beneficial owner of these aircraft and all other collateral foreclosed upon, including the SLV claims against Delta under the applicable Leases for N803 and N804.

On or about December 15, 2005, BNY entered into agreements to sell N803 and N804 to United Parcel Service Company. Such transactions closed on March 31, 2006, each for approximately $34 million in net proceeds. NW D. 30, Fenning Decl. at Exs. 4 and 5. On or about August 18, 2006, BNY filed proof of claim nos. 5326 and 5327 on behalf of the Lenders, seeking payment of SLV with respect to the two MD-11s, less the net proceeds of the sales, plus outstanding rent. *Id.* The first claim is for $68,875,333; the latter is for $72,826,243. *Id.*

    4.    <u>Post-Petition Transactions Concerning N182</u>

During the course the bankruptcy, an ad hoc committee of lenders negotiated with Delta a term sheet (the "Term Sheet") restructuring Delta's obligations with respect to 88 aircraft in the Delta fleet, including N182. Delta D. 1, Order Approving Term Sheet at Ex. A, Term Sheet. The Term Sheet contemplates, among other things, foreclosure upon

the collateral by the indenture trustee, followed by rejection of the applicable Leases and, thereafter, execution of new, post-petition leases. *See generally id.* On or about February 15, 2006, the Bankruptcy Court entered its *Order Approving a Modified Term Sheet and an Extension of Section 1110 Deadlines and Authorizing Agreements to Restructure Transactions Affecting Eighty-Eight Aircraft and Associated Engines, Equipment and Documents* [docket no. 2097] (the "Term Sheet Order"). *Id.*

Pursuant to the Court-approved Term Sheet, Delta agreed, among other things, that the indenture trustee and the lenders "shall have an unsecured prepetition claim for deficiency amounts" as a result of Delta's Lease defaults. *Id.* at 2. On or about August 18, 2006, BNY filed proof of claim no. 5335, seeking damages with respect to all of the Term Sheet aircraft, including N182 in the amount of $25,456,076. NW D. 30, Fenning Decl. at Ex. 6. On or about December 29, 2006, Northwestern Mutual consensually transferred all of its right, title and interest in, *inter alia*, the N182 Lease and the aircraft to the applicable lender. *See* NW Br. at 11 (acknowledging foreclosure).

## ARGUMENT

BNY is not a party to the TIAs and thus takes no position as to whether or not Northwestern Mutual is indemnified for any tax losses it has incurred. However, because certain arguments advanced by Northwestern Mutual affect BNY's rights and obligations with respect to both the transactions at issue and numerous other leveraged lease transactions being litigated below, BNY responds to those specific arguments. BNY also reserves the right to address any arguments affecting its interests raised by Delta in the cross-appeal.

A. **Neither the Indenture nor the Structure of Leveraged Lease Transactions Caps Delta's Payment Obligation at the Full SLV Amount**

Apart from basing its indemnification argument upon the language of the applicable TIA, Northwestern Mutual also contends that other agreements, as well as the overall structure of leveraged lease transactions, support its position. In particular, Northwestern Mutual argues that leveraged lease transactions are structured so that the owner participants' tax losses are always covered. Either (a) SLV is paid in full and Northwestern Mutual shares in that payment, thereby covering its tax losses through the so-called "waterfall" provisions set forth in the Indenture, NW D. 13 at Ex. 3, Indenture §3.03 at 40-42, or (b) SLV is not paid in full, in which case the TIA exclusion does not apply, and Northwestern Mutual can recoup any tax losses under the TIA (the "structural" argument). NW Br. at 4, 13, 21-22. As shown below, "prong (a)" of Northwestern Mutual's structural argument is not correct where, as here, there has been a strict foreclosure. Significantly, this inaccuracy creates the false impression that leveraged lease transactions are structured so that, upon a lease default, a lessee never has to pay more than the full SLV amount.

It is true that Section 3.03 of the Indenture provides that payments received by BNY after an Indenture default (which is defined to include a Lease default), should cascade through a payment waterfall as follows: first, to the indenture trustee to cover its expenses; second, to the noteholders to cover unpaid principal and interest owed to them; and, third, to the extent there is anything left, the owner trustee. NW D. 13 at Ex. 3, Indenture §3.03 at 40-42. However, application of the waterfall provision assumes that the owner trustee, as the Lessor and the assignor of its leasehold interest to the indenture trustee, has a residual interest in the SLV.

Where, as here, there has been a strict foreclosure, the indenture trustee becomes the outright owner of the foreclosed-upon collateral, which includes the rights under the Lease and any SLV payments due under that agreement. As stated in the Uniform Commercial Code, "A secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures . . . transfers to the secured party all of a debtor's rights in the collateral[.]" N.Y.U.C.C. § 9-622(a)(2) (McKinney 2007). *See also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994) (explaining that in a strict foreclosure, "the borrower's entire interest in the property [is] forfeited, regardless of any accumulated equity."); *Harris v. Key Bank Nat'l Ass'n*, 193 F. Supp. 2d 707, 715 n.4 (W.D.N.Y. 2002) (stating that "in the event of such a 'strict foreclosure,' it appears that plaintiffs would have had no right to any 'surplus' from whatever disposition of the collateral the secured party chose to make, since, upon completion of the foreclosure, the secured party would have become the absolute owner of the collateral; in fact, the secured party in that scenario would have no obligation to 'dispose' of the collateral at all."), *aff'd*, 51 F.App'x 346 (2d Cir. 2002). At this point, therefore, no part of the SLV -- whether or not paid in full – will ever flow through to Northwestern Mutual.

This overlooked fact renders incorrect Northwestern Mutual's contention that leveraged lease transactions are structured to cover owner participant tax losses through a full SLV payment that cascades through the Indenture's waterfall. *See* NW Br. at 4, 13, 21-22. Owner participant tax losses often occur as a result of foreclosure upon the aircraft. At that point, the debt is extinguished -- even if the proceeds from the collateral foreclosed upon are insufficient to pay the lenders the outstanding principal and interest due them (the debt being non-recourse) -- and the owner participant, as the beneficiary of

the owner trust, is deemed to recognize taxable income in the form of debt forgiveness. The amount of the income recognized is essentially comparable to the income the owner participant would have realized over the course of the Lease from rental payments had there been no default.  However, the owner participant suffers a tax loss as a consequence of foreclosure because it must recognize such income at an earlier date (i.e., the date of foreclosure) than would have been the case if the transaction had run full term.  If there is a strict foreclosure, none of the SLV payment received by the indenture trustee will be available to compensate the owner participant for this "time value of money" harm.

This shows the irrelevance of Northwestern Mutual's hypothetical discussion about BNY stipulating to a vastly reduced SLV payment.  *See* NW Br. at 20.  After the strict foreclosure, BNY owned the SLV and was thus free to compromise it as BNY saw fit.  Indeed, even before foreclosure, BNY could have exercised remedies under the Lease, NW D. 13 at Ex. 3, Indenture at Granting Clause at 3, §4.04 at 52; NW D. 13 at Ex. 2, Lease §15(g) at 62, which would have included the right to compromise the SLV payment, provided such compromise was commercially reasonable.  *See* N.Y.U.C.C. § 9-610(b) (McKinney 2007).  In any event, all of this is academic because no such compromise of the SLV here occurred.  BNY makes these clarifications strictly to protect against potential findings that could adversely affect BNY's rights in the event of any remand or in connection with related proceedings.

None of the above is intended to suggest that Northwestern Mutual lacks a TIA claim in the circumstances here presented.  Rather, BNY makes these points simply to demonstrate that if, indeed, Northwestern Mutual is indemnified for its tax losses, that is solely because the TIA provides for that result.  Leveraged lease transactions can be

structured so that full payment of SLV does not extinguish the lessee's separate indemnification obligations under the TIA or, on the other hand, can be structured so that even if SLV is not paid in full, the tax indemnity obligations are, nonetheless, extinguished. It is all simply a matter of the indemnification terms that have been contracted for under the TIA, not a matter of the inherent structure of leveraged lease transactions. As the Bankruptcy Court below explained, "the owner participant has no right to be compensated for its tax risk *unless* it contracts for such protection from the lessee in a TIA. . . . [I]t is the TIA alone which gives the owner participant a right to indemnification measured by the injury, but only to the extent agreed upon in the TIA." NW D. 39, Decision at 7.

Northwestern Mutual's "structural" argument is not only incorrect to the extent it assumes that a full SLV payment will necessarily make it whole, its argument creates the false impression that in leveraged lease transactions, the maximum a lessee ever has to pay is full SLV upon a lease default. This is incorrect, as the Bankruptcy Court below explained:

> Delta made an agreement to pay what it agreed to pay to the owner participant under the TIA. Delta also made a separate agreement requiring it to pay SLV under the Lease knowing that the Lease would be assigned to the indenture trustee as collateral security for the owner trustee's debt to the lenders. Each agreement was freely negotiated and fully supported by fair consideration on both sides. If a component of the SLV claim under the Lease is calculated by reference to the owner participant's tax consequences which are indemnified under the TIA (the "overlap" Delta objects to), so be it. That is what Delta agreed to and what both the owner participant and the indenture trustee relied upon in negotiating the agreements. If Delta has contracted to pay duplicative claims, then it must pay both – it cannot repudiate its duty to party A under contract A by asserting

>> that it contracted to pay the same amount to party B under contract B.

*Id.* at 8.  In the final analysis, if the TIA excludes indemnification only in circumstances where there has been full payment of the SLV, that is strictly because the TIA so provides, not because SLV is necessarily the maximum amount that lessees must pay in leveraged lease transactions.

**B.     The Indenture Trustee Did Not Violate the Operative Documents in Entering into the Term Sheet Agreement**

With respect to N182, BNY again takes no position as to whether the applicable TIA covers Northwestern Mutual's tax losses, but objects to Northwestern Mutual's argument to the extent it is predicated upon BNY and Delta entering into a "prohibited transaction."  Northwestern Mutual argues that a "negotiated damages claim resulting from a prohibited transaction – however calculated – cannot, as a matter of contract interpretation, constitute a liquidated damages claim for SLV under the terms of the Lease."  NW Br. at 23.  As shown below, the Term Sheet transaction, undertaken with the approval by the Bankruptcy Court, does not contravene the Lease, Indenture or any other agreement.  Indeed, as stated by Northwestern Mutual in connection with the hearing on its reconsideration motion, the Term Sheet deal is "perfectly legal between Delta and the particular creditors" represented by BNY.  NW D. 45, July 10, 2007 Tr. at 9:11-12.

Northwestern Mutual first argues that the Lease bars the transactions undertaken pursuant to the Term Sheet Order.  As an initial matter, Northwestern Mutual is not even a party to the Lease, and thus has no standing to invoke its provisions.  More importantly, the Lease in no way precludes the restructuring transactions that have occurred.  According to Northwestern Mutual, the Term Sheet deal is prohibited because Section 5

of the Lease sets forth only "five alternative ways in which Delta is permitted to exit from the Leases." NW Br. at 23. Section 5 deals with Lease renewal options and purchase options granted to Delta, as well as the return of the aircraft at the conclusion of the Lease term. NW D. 13 at Ex. 2, Lease §5 at 21-27. This provision has nothing to do with that which here transpired: foreclosure (permitted under Section 15 of the Lease and Article 9 of the UCC), followed by rejection of the Lease (authorized under Section 365(a) of the Bankruptcy Code), followed by execution of a new, post-petition lease, all as authorized by the Bankruptcy Court in its Term Sheet Order. Delta D. 1, Order Approving Term Sheet. With all due respect, it simply makes no sense to argue that Lease provisions granting Delta certain lease renewal and purchase rights somehow protect the owner participant from BNY foreclosing upon its security interest after a Lease default and thereafter re-leasing the Aircraft.

In fact, the Indenture expressly contemplates the indenture trustee foreclosing and re-letting the Aircraft. It provides that the indenture trustee, after taking title, "shall have the right to . . . lease . . . the Indenture Estate" and may "enter into any and all such agreements with respect to . . . leasing . . . of the Indenture Estate." NW D. 13 at Ex. 3, Indenture §4.05(b) at 54. The "Indenture Estate" is defined to include the aircraft and applicable Lease. *Id.* §1.01 at 10. Such remedy may be exercised "to the exclusion of the Owner Trustee and the Owner Participant." *Id.* §5.09 at 63. Thus, the supposedly proscribed transaction is one expressly contemplated by the Indenture.

Northwestern Mutual next argues that BNY cannot exercise remedies that result in Delta retaining possession of the Aircraft. For this proposition, Northwestern Mutual first cites Section 9(a) of the Lease, NW Br. at 23 – another provision with absolutely no

application. Section 9(a) concerns the Lessee's right to voluntarily terminate the Lease after eight years in the event the Lessee certifies that the aircraft has become "obsolete or surplus with respect to Lessee's requirements." NW D. 13 at Ex. 2, Lease §9(a) at 39. In that circumstance, bids for the purchase of the aircraft may be sought, but neither "Lessee nor any of its affiliates may submit a bid." *Id.* at 40. Northwestern Mutual, tries to argue that this bidding restriction on the Lessee -- which makes perfect sense given the Lessee's certification of the aircraft as obsolete or surplus – somehow precludes Delta from re-leasing an aircraft that is *not* obsolete or surplus. The argument simply ignores the language and purpose of the Section 9, which is no way bars or bears upon the Term Sheet transactions.

Citing to no particular provision of Section 15 of the Lease (which is close to four pages long), Northwestern Mutual also asserts that "**the Lease prohibits Delta from retaining the aircraft after a breach of the Lease.**" NW Br. at 23-24 (emphasis in original). But, nothing in Section 15 actually sets forth any such restriction, and the use of bolded and underscored text does not make it so. Indeed, to the contrary, the remedies set forth in Section 15 of the Lease are expressly intended not to limit the Lessor's remedies: Lessor may "exercise any other right or remedy which may be available under applicable law." NW D. 13 at Ex. 2, Lease §15(g) at 62. In this context, references to "Lessor" are understood to include BNY, as pledgee of the Lease acting as a secured party in control of its collateral post-default.

Finally, turning to the Indenture, Northwestern Mutual argues that the "reduction of the purported 'SLV' amount also violates Northwestern Mutual's protections against the Indenture Trustee's unilateral waiver or modification of any Indenture terms,

including Section 3.03's provisions assuring Northwestern Mutual the residual value of SLV payments. (Indenture §3.03 at 40-42; §5.09 at 63)." NW Br. at 24. Nothing, however, in the Indenture is in any way inconsistent with the transactions entered into pursuant to the Term Sheet Order.

Section 3.03 – the "waterfall" provision – sets forth how payments are to be applied by the indenture trustee after an Indenture default. That provision merely addresses *how* post-default payments will be applied (again, so long as the owner trustee retains a residual interest in the SLV, which is not the case here).

The other Indenture provision cited by Northwestern Mutual – Section 5.09 – in equally inapposite. It bars amendment of the Lease, Indenture or other transaction documents without the consent of the owner participant. NW D. 13 at Ex. 3, Indenture §5.09(d) at 63. But, the agreements executed in connection with the Term Sheet are not *amendments* of the leveraged lease documents; they are entirely *new agreements* executed after Northwestern Mutual's equity interest had been consensually foreclosed out. As noted above, such post-foreclosure agreements are expressly contemplated and sanctioned by the Indenture. NW D. 13 at Ex. 3, Indenture §4.05(b) at 54. Further, the Term Sheet agreements (e.g., the new lease) were executed after Delta rejected the Lease and Indenture. As there has been <u>no</u> amendment of the Lease or Indenture, Northwestern Mutual's argument that BNY improperly amended them should be rejected.

Additionally, as the Bankruptcy Court below found in considering an analogous argument in another contested matter in the Delta bankruptcy, a "non-impairment of rights" provision in a contract, such as the consent provision found in Section 5.09 of the Indenture, "is not concerned with default or bankruptcy or other events beyond the

control of [the trustee] – it relates to consensual modifications of the Indenture [Documents]." *In re Delta Air Lines, Inc.*, 370 B.R. 537, 546 (Bankr. S.D.N.Y. 2007), *aff'd,* 374 B.R. 516 (S.D.N.Y. 2007) ("*Cincinnati Airport*").  BNY did not consensually modify the Lease.  Delta filed for bankruptcy and therefore had the right to reject the Lease – a circumstance beyond the control of the indenture trustee.  As this Court recognized in affirming *Cincinnati Airport*, "[N]on-impairment clauses . . . become moot in the context of a default because of bankruptcy."  374 B.R. at 527.  Thus, even if BNY had sought merely to amend the Lease and Indenture (rather than execute entirely new agreements after foreclosure and rejection), the consent provision in the Indenture would, in any event, still be inapplicable.  In sum, nothing about the Term Sheet transactions contravenes either the Lease or the Indenture or any other agreement.

## CONCLUSION

For all of the reasons set forth above, BNY respectfully requests that the Court, in construing the applicable TIAs, reject Northwestern Mutual's structural argument and its contention that the Term Sheet transactions are prohibited by the Lease and Indenture.

New York, New York
Dated:  November 13, 2007

<table>
<tr><td></td><td>By:</td><td>s/ <em>Eric Fishman</em><br>Leo T. Crowley (LC-1311)<br>Eric Fishman (EF-9664)<br>Margot Erlich (ME-2117)<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>1540 Broadway<br>New York, NY 10036-4039<br>(212) 858-1740<br><br>Attorneys for Appellee The Bank of New York, as Indenture Trustee and Pass Through Trustee</td></tr>
</table>