Lisa Hill Fenning (LF-9016) – *Admitted Pro Hac Vice*
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, California  90071-1530
Tel:  (213) 621-6000 / Fax:  (213) 621-6100
lfenning@dl.com

Elizabeth M. Guffy (EG-8659) – *Admitted Pro Hac Vice*
DEWEY & LEBOEUF LLP
401 Congress Avenue, Suite 3200
Austin, Texas  78701
Tel:  (512) 226-0300 / Fax:  (512) 226-0333
eguffy@dl.com

Irena  M. Goldstein (IG-0736)
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York  10019-6092
Tel:  (212) 259-8000 / Fax:  (212) 259-6333
igoldstein@dl.com

*Counsel for Appellant*
*The Northwestern Mutual Life Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

| | |
|---|---|
| **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,** : | **Case No. 07-CV-7745 (RB)** (ECF Case) |
| **Appellant,** : | Chapter 11 Case No. 05-17923 (ASH) |
| **v.** : | |
| **DELTA AIR LINES, INC. and THE POST-EFFECTIVE DATE COMMITTEE OF DELTA AIR LINES, INC.,** : | (Jointly Administered) |
| **Appellees.** : | |

---------------------------------------------------------------X

**APPELLANT'S REPLY BRIEF ON APPEAL; AND**
**RESPONSE BRIEF ON DELTA'S CROSS-APPEAL**

The Amended Response Brief of Appellees Delta Air Lines, Inc. and the Post-Effective Date Committee ("Delta Response," and the appellees collectively, "Delta") does not address the crux of this appeal: Northwestern Mutual's TIA Claims[1] are valid and enforceable – and therefore must be allowed – because Delta's purported contractual defense would fail if the claims were adjudicated under state law. The bankruptcy court ignored this bedrock principle of bankruptcy law, wholly failing to analyze these claims based upon their validity and enforceability under state law. Instead, it concluded that the parties "must have" intended that the terms of the TIAs and other Operative Documents be interpreted differently in the event of a Delta bankruptcy, rendering unenforceable in bankruptcy claims that are enforceable under state law. Such a result contravenes Butner v. United States, 440 U.S. 48 (1979), and Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co., 127 S.Ct. 1199 (2007), and must be reversed.

Moreover, even if the parties could have intended the word "pays" to mean something different in bankruptcy, they did not do so. On the contrary, the key Operative Documents state that "payment" means the same thing in a Delta bankruptcy filing. (Lease §20 at 64-65.) It was erroneous for the bankruptcy court to infer that the parties "must have" intended that a partial distribution in Delta stock would satisfy the payment requirement of the Section 6(c) defense, from nothing more than the fact that the Operative Documents mention the word "bankruptcy."[2]

The Decision threatens a key premise of this widely used financing vehicle for aircraft and equipment acquisition: that owner participants will have enforceable indemnification claims for the extra taxes they must pay due to the recapture of accelerated depreciation, if that loss of tax benefits results from Trigger Events (such as

---

[1]  All capitalized terms not otherwise defined herein have the same meaning as the definitions in Northwestern Mutual's Opening Brief on Appeal. ("Opening Brief).

[2]  The bankruptcy judge addressed the interpretation issue strictly as a matter of law. Should this Court determine that Section 6(c) is ambiguous, the ruling below should be reversed and remanded.

foreclosure) that are not "excluded" by the narrow <u>contractual</u> exclusions.  Owner participants assume the risk that their TIA claims may receive only a partial distribution in bankruptcy, but not that their claims will vanish.  The bankruptcy court's erroneous interpretation would nullify all bankruptcy claims under similarly structured tax indemnification agreements, including the approximately $1 billion of TIA claims in this case.  No other case has so held. [3]

I.    **THE TIA CLAIMS MUST BE ALLOWED BECAUSE THEY ARE VALID AND ENFORCEABLE UNDER STATE LAW.**

In its briefing below and before this Court, Delta has not contested Northwestern Mutual's analysis of how these contracts would be interpreted in a state enforcement action, and the bankruptcy court failed to address this threshold issue.  This Court should follow the mandate of <u>Butner</u> and <u>Travelers</u> and do what the bankruptcy court did not: begin its analysis with a determination as to whether the TIA Claims would have been enforceable under state law.

If Northwestern Mutual had sought enforcement of the TIAs in a diversity action, this Court would be required to apply New York law as to whether Delta has established all elements of a Section 6(c) defense where (i) Delta has defaulted on the Leases, (ii) the Indenture Trustee has foreclosed on the aircraft, (iii) Northwestern Mutual has incurred resulting tax Losses within the meaning of Section 5(a) of the TIAs, and (iv) no part of SLV has yet been paid.

Delta does not dispute any of these facts and circumstances but instead asserts that the TIA excuses it from liability because the Loss arises from an "event whereby [it] pays Stipulated Loss Value. . . or an amount determined by reference thereto. . . ."  (TIA

---

[3]    The <u>unreported</u> decision in <u>Northwest Airlines</u> does <u>not</u> so hold; it discusses the Decision in *dicta*.  Delta's attempt to bolster the Decision here by referencing <u>Northwest Airlines</u> is thus circular and unpersuasive.  In that case, all parties accepted the Decision without challenging its correctness, because the issue there was <u>not</u> the validity of a TIA claim, but rather an owner participant's objection to the approval of a post-foreclosure lease restructuring agreement.  Judge Gropper had neither the facts nor the law before him to evaluate the soundness of the Decision – and he was not asked to do so.

§6(c) at 17.)  The question is what the parties meant by "pays" for purposes of satisfying this exclusion.  The contracts themselves answer that question:  they explicitly require that all payments be made – whether under the Leases or TIAs – in U.S. dollars, not in pesos, euros, common stock, or in kind.  (Lease §3(d) at 17 ("All payments pursuant to this Lease shall be received . . . in U.S. Dollars . . ."); TIA §12 at 28 ("Payments made by Lessee . . . shall be made in United States dollars . . .").)[4]  The TIA obligations must be "paid in full."  (Lease § 15 at 62; TIA §10 at 27.)[5]  There is no need to consult Black's Law Dictionary or Webster's Dictionary to divine contracting parties' intent when the contracts themselves specify the meaning of a term.

Northwestern Mutual submits that any New York state court – and this Court sitting in diversity – would reject Delta's Section 6(c) defense.  Under New York law, a distribution of Delta stock worth, for example, less than $30 million on account of the $59 million IT Claim for N803DE would not satisfy the Section 6(c) defense, because it is not a $59 million payment in cash.  (See Opening Brief at 13, 21-22.)  Neither Delta nor the bankruptcy court even address, much less refute, the conclusion that Delta's Section 6(c) defense would fail under state law applied in a nonbankruptcy forum.

## II.    THE PARTIES DID NOT INTEND A DIFFERENT INTERPRETATION OF "PAYS" IN A DELTA BANKRUPTCY CASE.

The bankruptcy court interpreted the parties' agreements by "reading" them in a "bankruptcy context," contrary to the line of Supreme Court decisions that culminated in Travelers.  (D. 39, Decision at 14; D. 45, Tr. of July 10 Tel. Conf. at 12-13, 15.)  This Court is not required to give any deference to the bankruptcy court's ruling, explanations,

---

[4]   Delta argues that the fact that the Fair Market Value of the aircraft could be deducted in determining the net SLV amount payable under the Lease somehow nullifies the "payment in cash" requirements.  It does not.  The remaining balance of Delta's SLV obligation, calculated after giving effect to the value of the aircraft (which itself must be on a dollar-for-dollar basis), must still be paid in U.S. dollars, not Delta stock.

[5]   Contrary to Delta's arguments, "importing" the terms for payment of SLV into Section 6(c) of the TIA is necessary to give effect to that provision because the Lease – and not the TIA – creates the obligation to pay SLV and determines how and when it is paid.  (See Opening Brief at 19.)

or comments, as *de novo* review is the standard for purely legal issues of contract interpretation. (See Opening Brief at 5.)

Supposedly based upon the contracts,[6] the bankruptcy court concluded that Northwestern Mutual and Delta "must have" intended that the word "pays" mean something different if Delta is in bankruptcy, solely because the word "bankruptcy" is mentioned. (D. 45, Tr. of July 10 Tel. Conf. at 12-13.) This reasoning is fallacious. The parties did indeed consider the implications of bankruptcy in the Operative Documents but, contrary to the bankruptcy court's superficial inference, the parties expressly provided that Delta's obligations to pay SLV and TIA amounts (both of which are included in the definition of Supplemental Rent (Lease §1 at 13)) would not change in nature, amount or form in a Delta bankruptcy:

> No Set-Off, Counterclaim, etc. . . . Lessee's obligations to pay all Rent (including, but not limited to, amounts payable as Supplemental Rent) payable hereunder and all amounts payable by Lessee under the Participation Agreement shall be absolute and unconditional and shall not be affected by any circumstance whatsoever, including, without limitation, . . . (c) any insolvency, bankruptcy reorganization or similar proceedings by or against lessee . . . If for any reason this Lease shall be terminated in whole or in part by operation of law or otherwise except as specifically provided herein, Lessee nonetheless shall pay to the party entitled to such payment pursuant to the provisions hereof an amount equal to each Rent payment . . . in accordance with the terms hereof had this Lease not been so terminated.

(Lease §20 at 64-65) (emphasis supplied). It is hard to imagine a more emphatic rejection of the proposition that the term "pays" should be interpreted differently if Delta files a bankruptcy petition.[7] The bankruptcy court's ruling that the parties "must have" intended that "pays" mean something different in bankruptcy is thus flatly contradicted

---

[6] Delta accuses Northwestern Mutual of "insulting" the bankruptcy court when it pointed out that the judge admitted that he had not read Northwestern Mutual's contracts before rendering the Decision premised upon "bankruptcy" language that did not in fact appear in the Northwestern Mutual TIAs. (Delta Resp. at n. 9, p. 10.) It is no insult to state an admitted fact: in footnote 3 of the Decision, the judge erroneously claimed that the Northwestern Mutual contracts were not part of the record – thereby necessarily admitting he had not read them. (D. 39, Decision at 14 n. 3.)

[7] No parallel provision exists in the TIA, of course, because the TIA does not mention or reference "bankruptcy" at all.

by the terms of the Operative Documents.  Neither Delta nor the lower court cites any contract provision to the contrary.  The "context of bankruptcy" rationale is merely a free-floating, bankruptcy-judge-made rule of precisely the kind struck down in <u>Travelers</u>.

## III.    DELTA ERRONEOUSLY CONFLATES THE CONCEPT OF CLAIMS "ALLOWANCE" WITH CLAIMS "DISTRIBUTION."

Delta's focus on the fact that it will be discharged from liability to the holders of the IT Claims upon payment of some fraction of the allowed amount is misleading.  Contrary to <u>Butner</u> and <u>Travelers</u>, Delta attempts to import the question of "discharge" into the analysis of "allowance" of these contract claims as they would be enforced by a state court.  But a Chapter 11 debtor's ability to discharge a claim by partial payment has nothing to do with the determination of the validity and enforceability of claims pursuant to Bankruptcy Code §502.  (<u>See</u> Opening Brief at 15-18.)  Claims must first be "allowed" before they are subject to reduction for distributional purposes.  Northwestern Mutual does not dispute Delta's right to discharge allowed claims pursuant to a *pro rata* distribution.  However, Northwestern Mutual does insist on its right to have its contract claims allowed on the basis that they would have been under applicable nonbankruptcy law—which is the standard reiterated in <u>Travelers</u>.

## IV.    NORTHWESTERN MUTUAL'S ARGUMENTS CONCERNING SECTION 5(A) OF THE TIA ARE PROPERLY BEFORE THE COURT.

Under federal tax law, Northwestern Mutual's tax loss occurred upon the foreclosure sale of the aircraft, not when Delta defaulted upon the Lease, because a transfer upon the foreclosure of a security interest is a "disposition" by the defaulting taxpayer – a taxable event.  26 U.S.C. §§ 61(3) (gain on disposition of property is income), 1245 (gain on disposition of property is equal to amount realized over adjusted basis); Treas. Regs. §§ 1.1245-1(a)(3) (the term "disposition" includes a transfer upon the foreclosure of a security interest).  The tax Northwestern Mutual paid on the depreciation recapture on the foreclosure sales is the amount claimed in the TIA Claims.  Although any Aircraft foreclosure implies a Delta default under the Leases, it does not follow that,

as Delta argues (Delta Resp. at 17-18), the Section 5(a)(iv) "foreclosure" event is somehow extinguished as an independent basis for a TIA Claim by the Section 5(a)(vi) "obligation to pay SLV" event merely because both are premised upon a Delta lease default.  Such an interpretation would render Section 5(a)(iv) mere surplusage, as neither basis for a TIA claim would ever arise absent a default under the Lease.  Northwestern Mutual has consistently argued that its TIA Claims were triggered by the Aircraft foreclosures, not by Delta's obligation to pay SLV.  (D. 12, Resp. of Northwestern Mutual at 9.)

## V.    "DETERMINED WITH REFERENCE" TO SLV CANNOT MEAN WHAT THE BANKRUPTCY COURT HELD IT TO MEAN.

"Determined with reference" to SLV cannot mean any arbitrary calculation that involves SLV as part of the equation.  Delta's arguments would lead inescapably to the conclusion that any payment, no matter how small, calculated in some way that involves SLV would satisfy the provisions of Section 6(c) – even a payment of 0.01% of SLV, an outcome that is nonsensical.  The only sensible approach to interpretation is to look to the Operative Documents to determine the meaning of that phrase.  (See Opening Brief at 21-22.)

The Term Sheet Claim also fails to qualify as "payment" of SLV under the Operative Documents for a second reason.  Contrary to Delta's interpretation, the Operative Documents are designed to prevent collusion by the Lessee and the Indenture Trustee to retain the value of the transaction for themselves at the expense of the Owner Participant's TIA and other rights.  Upon demand, Lease §15(c) obligates the defaulting Lessee to pay the excess of SLV over the Aircraft's Fair Market Value ("FMV").  If the Indenture Trustee does not insist upon a sale of the Aircraft and permits Delta to keep it, the FMV to be credited against Delta's Section 15(c) SLV payment obligation "shall be deemed to be zero."  (Lease §5(b)(ii) at 23.)  The Term Sheet does not apply this contractual formula, but instead grants Delta two contractually impermissible and

unauthorized credits to be deducted from the contractual SLV amount as of the petition date:  (i) the discounted residual value of the Aircraft ("based upon a half-life base value appraisal" of the Aircraft), and (ii) the aggregate rent to be received under the Term Sheet and the restructured lease.  (CD. 1, Order Approving Modified Term Sheet, Ex. A at 3.) These improper deductions result in a Term Sheet Claim of $25.5 million, instead of an SLV amount of $62.1 million calculated according to the Operative Documents.[8]  (D. 30, Fenning Decl. Ex. 6, Term Sheet Claim at Ex. B.)  This result violates the requirement of TIA §2(e) that "any payment [of SLV] is required to be <u>made in accordance with the Operative Documents</u>."  (emphasis supplied)

## VI.    REPLY TO BNY'S RESPONSE: ITS TANGENTIAL ARGUMENTS ARE CONTRADICTED BY THE  CONTRACTS AND THE FACTS.

BNY also filed a responsive brief (the "<u>BNY Response</u>") that it characterized as merely "protective" because Northwestern Mutual did not appeal from that portion of the Decision that overruled Delta's objections to the IT Claims.  Taking no position as to whether this Court should affirm or reverse the bankruptcy court's disallowance of Northwestern Mutual's TIA Claims, BNY argues that a reversal should not adversely affect the IT Claims.  Therefore, this Court need not consider the BNY Response at all.

In any event, BNY's contractual interpretation arguments are not well founded. For example, BNY relies solely upon generic Uniform Commercial Code ("<u>U.C.C.</u>") provisions in arguing that "the indenture trustee becomes the outright owner of the foreclosed-upon collateral, which includes the rights under the Lease and any SLV payments due under that agreement."  (BNY Resp. at 9.)  Here, however, the parties supplanted the default result under the U.C.C. by agreeing otherwise.  The Indenture requires the Indenture Trustee to pay to the Owner Trust any residual payments received or amounts realized <u>even after foreclosure</u>:

---

[8]  SLV is calculated by multiplying the percentage of lessor's cost (*i.e.*, 85.25%) for the next preceding date before the petition date (*i.e.*, 8/30/05) per Lease, Sch. C, by the Lessor's cost of $72.5 million (per Participation Agreement, Sch. A).

> Except as otherwise provided . . ., all payments received and all amounts . . . realized by the Indenture Trustee . . . <u>after the Indenture Trustee shall foreclose or otherwise enforce this Indenture,</u> shall be promptly distributed by the Indenture Trustee in the following order of priority:
>
> * * *
>
> <u>fifth</u>, the balance, if any, of such payments or amount remaining thereafter shall be distributed to the Owner Trustee for distribution pursuant to the Trust Agreement.

(Indenture §3.03 at 40-42) (emphasis added). Thus, BNY's position is directly contradicted by provisions of the Indenture that it has not bothered to cite.

Similarly, BNY's argument that the Term Sheet for the N182DN deal was permitted under the circumstances is contrary to undisputed facts. Although arguing that it could do whatever it wanted with the aircraft <u>after</u> foreclosure, BNY admits that Indenture §5.09 prohibits the Indenture Trustee from amending the Lease without consent of the Owner Participant <u>before</u> foreclosure. (BNY Resp. at 15.) BNY nevertheless asserts that the deal was permissible because "the Term Sheet agreements (e.g., the new lease) were executed after Delta rejected the Lease and Indenture." (BNY Resp. at 15.) In fact, the record establishes that BNY agreed to the Term Sheet before February 15, 2006. (CD. 1, Order Approving Modified Term Sheet, Ex. A at 3.) The N182DN foreclosure did not occur until December 2006, and the Lease was not rejected until June 2007. (Supp. CD. 1, Notice of Intent to Reject.) <u>Long before either rejection or foreclosure</u>, BNY contracted to amend the existing Lease or enter into a new lease. Like BNY's other arguments, its Term Sheet contentions are contrary to the Operative Documents' express terms and inconsistent with the undisputed facts, and should be disregarded.

## VII.    RESPONSE TO DELTA'S CROSS-APPEAL: THE BANKRUPTCY COURT CORRECTLY DECIDED THE "COSMIC OBJECTION."

In the Cross-Appeal, Delta seeks reversal of the Decision with respect to "overlap" arguments that the bankruptcy court dubbed Delta's "cosmic objection." This aspect of the Decision should be affirmed. As the Decision holds, the same "event" can

give rise to multiple contractual claims, where as here the competing claimants' rights arise under separate bilateral contracts with the debtor.  (D. 39, Decision at 7-8.)

Delta's few cited authorities for its "one injury, one claim" argument are readily distinguishable:  either the competing claimants conceded they were seeking to recover the "same" claim, or only a single creditor was involved.  Thus, for example, in both In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882 (Bankr. S.D.N.Y. 1993), and In re Chateaugay Corp., 115 B.R. 760 (Bankr. S.D.N.Y. 1990), the Pension Benefit Guaranty Corporation and the trustee of a failed pension plan fought over which party had the right to recover what were admittedly the same unfunded pension plan payments.[9]  In contrast, here Northwestern Mutual and the Indenture Trustees emphatically assert the separateness of their contract claims.  Delta alternatively argues without any authority that parties cannot contract to provide for more than one payment of a "loss."  Rejecting this proposition, the bankruptcy court observed, "the general legal principle that precludes double liability for a single injury has never been applied by any court to void separate contract obligations owed to different parties under different contracts."  (D. 39, Decision at 7) (emphasis in original).

Citing no authority whatsoever, Delta also introduces an argument – not raised at the trial level – that the IT Claims and the TIA Claims are not really held by different entities, because the Internal Revenue Code treats a grantor trust and its beneficiary as a single entity for tax purposes.  (Delta Resp. at 23-24.)  This argument wholly lacks merit. The tax regulations themselves specify that tax treatment of single-member entities is

---

[9]  Similarly, in the Matter of Brinke Transp., Inc., No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989), the parties conceded the duplicative nature of the competing claims filed by the National Labor Relations Board, an employer benefit fund, and the employees' union.  Similarly inapposite are Diversified Graphics, Ltd. v. Groves, 868 F.2d 293 (8th Cir. 1989), and In re Simetco, Inc., No. 93-61772, 1996 WL 651001, at *3 (Bankr. N.D. Ohio Feb. 15, 1996), where a single claimant either pled two causes of action or filed two claims on alternative theories.  In re T. R. Acquisition Corp., 309 B.R. 830, 837-38 (S.D.N.Y. 2003), does not even involve multiple claims, but rather a claim under a "double rent" penalty clause.  None of these cases involved a situation in which two parties sought to enforce claims arising under two separate contracts with the debtor.

independent of their corporate separateness for all other purposes, such as entering into and enforcing contracts.  See, e.g., Treas. Regs. §§ 301.7701-1 – 3 (the separateness of single-member business entities may be "disregarded" for tax purposes even though they otherwise qualify as separate legal entities under state law).

Finally, Delta falls back on an argument that paying both the IT Claims and the TIA Claims somehow contravenes bankruptcy policy.  The unstated (and unsupported) premise is that the Operative Documents would never result in an obligation to pay more than the SLV amount outside of bankruptcy.  (See discussion at D. 12, Resp. of Northwestern Mutual at 8-14.)  This argument, then, merely circles back to the question of proper interpretation of these contracts under state law which, for the reasons set forth above, should not vary in the "context of bankruptcy."

## VIII.  CONCLUSION

The ruling below erroneously employed a "bankruptcy context" standard that is contrary to controlling United States Supreme Court precedent and misinterpreted the parties' intent as evidenced by the terms of the contracts themselves.  Accordingly, the Decision and Order must be reversed.  This result is both fair and appropriate:  after benefiting from 13 years of lower financing costs under these leveraged Leases, Delta should not be permitted to renege on its indemnity obligations.  With respect to the Cross-Appeal, the ruling below was well-founded and should be affirmed.

Dated: November 27, 2007          By:    /s/ Lisa Hill Fenning
New York, New York                Lisa Hill Fenning (LF-9016) - *Admitted Pro Hac Vice*
                                  DEWEY & LEBOEUF LLP
                                  333 South Grand Avenue, 26th Floor
                                  Los Angeles, California 90071-1530
                                  Tel:  (213) 621-6000 / Fax:  (213) 621-6100
                                  lfenning@dl.com

                                  *Counsel for Appellant*
                                  *The Northwestern Mutual Life Insurance Company*

244561